**Marilyn Kay PLANTZ, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–89–279.**

Court of Criminal Appeals of Oklahoma.

May 20, 1994.

Rehearing Denied July 5, 1994.

Ronald F. Evans, Oklahoma City, for appellant at trial.

Robert Macy, Dist. Atty., Fern Smith, Asst. Dist. Atty., Oklahoma City, for the State at trial.

Anne M. Moore, Asst. Appellate Indigent Defender, Norman, for appellant on appeal.

Susan Brimer Loving, Atty. Gen., A. Diane Blalock, Asst. Atty. Gen., Oklahoma City, for the State on appeal.

## OPINION

LUMPKIN, Presiding Judge:

Appellant Marilyn Kay Plantz was tried by jury and convicted for the crimes of Murder in the First Degree (Count I) in violation of 21 O.S.Supp.1982, § 701.7; Third Degree Arson (Count II) in violation of 21 O.S.1981, § 1403(A); Solicitation to Commit Murder (Count III) in violation of 21 O.S.1981, §§ 701.7 & 701.16; and Conspiracy to Commit Murder (Count IV) in violation of 21 O.S.1981, §§ 421 & 701.7, Case No. CRF–86–4781, in the District Court of Oklahoma County. The jury recommended as punishment the death penalty for Count I; fifteen (15) years imprisonment and ten thousand dollar ($10,000) fine in Count II; one hundred (100) years imprisonment for Count III; and ten (10) years imprisonment on Count IV. The trial court sentenced accordingly and it is from this judgment and sentence that Appellant appeals.

Appellant and co-defendant Clifford Bryson were found guilty of the first degree murder of Appellant's husband, James Plantz. On August 26, 1988, at approximately 4:00 a.m., Mr. Plantz, a long time employee at the Oklahoma Publishing Company, left his job and headed home. At that time Mr. Plantz was insured for approximately two hundred ninety-nine thousand dollars ($299,-000.00). Appellant was the beneficiary. At approximately 5:15 a.m. that same morning, in the northeast part of Oklahoma City, the decedent's charred body was discovered inside his burned out pickup truck. The driver's side door was open. The decedent's body was slumped behind the steering wheel and his left leg was outside the pickup, his foot resting flat on the ground. Identified by dental records, an autopsy later revealed that the decedent had died from a combination of a blunt force injury to the head and thermal injuries caused by the fire.

The ensuing investigation into the homicide lead to Appellant and Bryson. They had an ongoing personal relationship and had previously attempted to have the decedent killed. Appellant had indicated to Bryson the decedent was abusive to her and she wanted to get rid of him and collect on his life insurance policy. Appellant had approached Bryson and Clinton McKimble [1]

---

1. Clinton McKimble was also charged with the first degree murder of James Plantz. He pled guilty to the charge in exchange for a life sentence.

about killing the decedent and collecting the life insurance proceeds. She suggested the men drive up on the side of his pickup and shoot him, or catch him coming home from work and beat him. McKimble was offered forty-five thousand dollars ($45,000.00) for his part. At that time, McKimble indicated he was not sure he wanted to be a part of the plan. He subsequently changed his mind. With Appellant's help, he and Bryson stole a car and waited for the decedent to get off work. The plan was to drive up behind the decedent, bump his pickup so that the decedent would have to pull over and exit the vehicle, at which time they would kill him with baseball bats provided by Appellant. When the men lost the decedent's pickup in the highway traffic, the plan was abandoned. Appellant subsequently gave Bryson a gun to shoot the decedent, but he pawned it.

Bryson subsequently offered Roderick Farris ($40,000.00) to kill the decedent. Terry Norman overheard Bryson say he had just talked to Appellant. She was upset because the decedent had physically assaulted her. When Farris asked why she just did not divorce the decedent, Bryson answered that she wanted to collect some money. Bryson indicated that if he had to kill the decedent by himself, he was going to catch the decedent coming home from work one morning, beat him with a baseball bat and set him on fire in his truck. A week later, Farris again encountered Bryson and Appellant at a local grocery store. Bryson offered Farris ten thousand dollars ($10,000.00) to kill the decedent. He then introduced Farris to Appellant as "the one I was telling you about that would kill your husband." Appellant told Farris it would have to look like an accident. Later that night Bryson, Farris, and McKimble met at the Plantz home where they ate hamburgers and listened to music while waiting for the decedent to come home from work. When Farris heard someone at the front door, Appellant told him if it was the decedent to "take him out now". Bryson picked up a hammer and McKimble a knife, but it was not the decedent. Later that night, Farris was arrested and jailed on an unrelated charge.

Two days later, Bryson and McKimble were again with Appellant. Bryson picked Appellant up from work, where she had just quit her job. Waiting for the decedent to go to work at 6:00 p.m., they drove around, going to a bank where Appellant withdrew money she subsequently spent on cocaine and beer. Arriving at the Plantz home later that evening, Appellant retired to her bedroom at approximately 10:30 p.m. Bryson and McKimble remained in the living room drinking beer and smoking cocaine until approximately 11:30 p.m., when they fell asleep. Hours later, hearing a key in the front door, they hid on opposite sides of the house. The decedent entered the house whistling, a bag of groceries in his arms. Bryson struck first, hitting the decedent with the baseball bat. The decedent cried out for Appellant, but Bryson hit him again with McKimble soon joining in. The men repeatedly struck the decedent because "he would not stay down". Finally, the decedent crumpled to the floor. As he lay moaning, Bryson and McKimble picked him up and took him outside, setting him beside his pickup truck. Appellant emerged from the house, handed the pickup keys to Bryson and commented that the decedent's "head was busted open" and that it was not going to look much like an accident. She told the men "to burn him." They placed him in the bed of his pickup and Bryson drove to a deserted location on the route the decedent would have taken to work. McKimble followed in Appellant's car. The decedent was then placed in the cab of the pickup, behind the steering wheel. His body slumped over to the side. McKimble placed a rag in the gas tank and lit it. It failed to catch on fire. Bryson then poured gasoline on the decedent and in the cab of the pickup. He threw a match in and the pickup caught on fire. As the men drove away, they turned around and saw the decedent raise up.

Bryson and McKimble returned to the Plantz home where Appellant was cleaning up the blood. McKimble helped clean the floor and while Appellant cleaned the baseball bats. She directed the men to exchange their bloody clothes for clothes belonging to the decedent. She placed their bloody clothes in a sack and told them to get rid of

the sack. The men soon left Appellant's home, throwing the sack of bloody clothes in the river. After going to a convenience store where they purchased sandwiches and drinks with money from the decedent's trousers, they went to a friends home, Michael Kendrick. Bryson and McKimble told Kendrick about killing the decedent. When asked about Appellant's two children, Bryson said they were asleep in their rooms at the time of the murder. Bryson phoned Appellant, asking if she was all right. Kendrick overheard Bryson to say that they must stay close and that Appellant had purchased a rug to cover up blood stains.

## PRE–TRIAL ISSUES

### A.

■ Appellant asserts in her first assignment of error that she was denied her constitutional right to a fair trial by the prejudicial joinder of her trial with that of co-defendant Bryson. Title 22 O.S.1981, § 434, provides that two or more defendants may be charged in the same information if they are alleged to have participated in the same act or series of acts constituting an offense or offenses. However, the trial of two or more co-defendants cannot be joined into one proceeding if they present mutually antagonistic defenses or the State introduces the statement of one non-testifying co-defendant which incriminates another co-defendant. See Cruz v. New York, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987); Murray v. State, 528 P.2d 739, 740 (Okl.Cr.1974). In the present case, the defendants did not present mutually antagonistic defenses nor did the State introduce an incriminating statement by a non-testifying co-defendant. Therefore, the joint trial was proper.

The record reflects that counsel for both Appellant and Mr. Bryson filed repeated motions for severance. In pre-trial hearings, Appellant indicated to the court that her defense was one of non-involvement in any plan to kill her husband, while counsel for

Mr. Bryson indicated that his defense would be one of "heat of passion", that he participated in the murder of the decedent out of love and concern for the Appellant.[2] During the first stage of trial, no evidence was presented by either Appellant or co-defendant Bryson. In cross-examination of the State's witnesses and in arguments to the jury, Appellant challenged the credibility of the State's witnesses, stressing their criminal convictions and drug abuse. Co-defendant Bryson, on the other hand, through his cross-examination of the State's witnesses, did not deny his involvement in the killing, but merely attempted to lessen his culpability by portraying himself as intoxicated at the time of the murder, acting at the direction of Appellant and calling into question the credibility of the State's witnesses.

This Court has held that defenses are mutually antagonistic where each defendant attempts to exculpate himself and inculpate his co-defendant. VanWoundenberg v. State, 720 P.2d 328, 331 (Okl.Cr.1986), cert. denied, 479 U.S. 956, 107 S.Ct. 447, 93 L.Ed.2d 395 (1986). Defenses have also been found to be antagonistic when in order for the trier of fact to believe the defense of one defendant, it must necessarily disbelieve the defense of the co-defendant. Neill v. State, 827 P.2d 884, 887 (Okl.Cr.1992). This two part test for establishing mutually antagonistic defenses requires a defendant to both (1) exculpate himself and (2) inculpate a co-defendant. Analyzing the evidence against each defendant separately, it is readily apparent both of these requirements were not met, as neither defendant attempted to exculpate him or herself by inculpating the other. Therefore, we find the defenses of Appellant and co-defendant Bryson were not mutually antagonistic and the trial court's denial of severance proper.

### B.

■ The remainder of Appellant's allegations of error will be addressed in the order

---

**2.** Discussions in pre-trial hearings frequently centered around the possible introduction of a video-taped confession of co-defendant Bryson. However, the tape was not admitted until second stage. Bryson's counsel commented that if the statement was not used, "it could in some manner correct the severance problem in the first stage and perhaps will 100 percent correct the problem." (M.Tr. 200.)

of trial proceedings and not in the order raised in her brief. Therefore, turning to her seventh assignment of error, Appellant relies on *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), to argue that the trial court erred in failing to grant her request for a state funded investigator. The State responds by asserting that Appellant did not make the requisite showing under *Ake* of need for the private investigator at state expense. While this Court has found that *Ake v. Oklahoma* "must necessarily be extended to include any expert which is 'necessary for an adequate defense,'" the defendant must be able to demonstrate a need for the expert to the trial court or substantial prejudice from the lack of such expertise. *Tibbs v. State*, 819 P.2d 1372, 1376–77 (Okl. Cr.1991), citing to *Ake v. State*, 778 P.2d 460, 464 n. 1 (Okl.Cr.1989). The statute in effect at the time of Appellant's trial, 22 O.S.Supp. 1985, § 464(B), allowed a trial court to provide an indigent defendant access to expert witnesses in a capital case upon a showing of necessity. This Court has stated that when the defendant does not demonstrate any need to the trial court for the experts or any substantial prejudice from the lack of the expert, then there has been no abuse of discretion by the trial court in denying a defendant an expert at state expense. *Tibbs*, 819 P.2d at 1377. Further, this Court has not determined investigators fall within the category of "experts" as defined by Section 464(B) of Title 22.

In the present case, Appellant failed to make a sufficient showing of need. In pretrial motions and arguments to the court, Appellant established that counsel was not financially able to afford to hire an investigator, but failed to relate any specific facts indicating why a private investigator was necessary.[3] Her argument seems to be that merely because the Public Defender, counsel for co-defendant Bryson, had three (3) investigators on staff, that she should have the benefit of three investigators.[4] Mere undeveloped assertions that the services of the experts are needed is not sufficient to qualify for funds. *Caldwell v. Mississippi*, 472 U.S. 320, 323–24, n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231, 236 n. 1 (1986). Contrary to Appellant's argument, setting forth certain specific facts showing the necessity of an investigator does not require the defendant to the inform the court of "precisely the information that he cannot know without the assistance being requested." (Appellant's brief, pg. 71). In the present case, counsel was appointed to represent Appellant approximately five (5) months before trial. Certainly within that time certain information pertinent to guilt or punishment and not merely counsel's financial condition or work load, was known and could have been presented to the trial court to show the need for an investigator.

Counsel's failure to do so is not indicative of ineffective assistance of counsel; Appellant's prejudice claim. The record reflects counsel filed and argued numerous motions; thoroughly cross-examined all State's witnesses, ably challenging their credibility; and presented numerous witnesses to testify in Appellant's behalf during the second stage of trial. Despite his protestations to the contrary, counsel appeared to be well prepared. In pleadings to the trial court either before or after trial, in pleadings before this Court and in her appellate brief, Appellant neither sets forth any specific facts which could have been presented to the trial court in support of the request for the state funded investigator nor does she set forth specific instances in support of her claim of ineffective assistance of counsel. In reviewing an ineffectiveness claim, every effort must be

---

3. The Application for Private Investigator listed the following reasons in support of the state funded expert: 1) Appellant was appointed counsel when a conflict was claimed by the Oklahoma County Public Defenders Office; 2) The Public Defenders Office is staffed by at least 3 full time investigators; 3) Appellant is indigent and but for a simple twist of fate would be represented by the Public Defenders Office; 4) Due process requires that Appellant be afforded the same opportunity for presenting a defense as other indigents accused of a capital offense; 5) The factual issues in this case are such that a thorough investigation is necessary; 6) Counsel is a solo practitioner unable to conduct the investigation himself. (O.R. 273).

4. Appellant does not mention how many, if any, of the 3 investigators on the Public Defenders staff actually worked on the present case.

made to eliminate the distorting effects of hindsight. Judicial scrutiny of counsel must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674, 694 (1984). See also *Boltz v. State,* 806 P.2d 1117, 1126 (Okl.Cr.1991).

In *Fisher v. State,* 736 P.2d 1003, 1013 (Okl.Cr.1987), this Court stated it would take appropriate action when defense counsel's pre-trial preparation and investigation are so woefully inadequate as to undermine confidence in the outcome of the trial. In the present case, Appellant has failed to show the assistance of a state funded investigator would have led to evidence which would have materially aided the defense so as to create a reasonable probability that the result of the trial would have been different under the standard set forth in *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

◼ Appellant further argues the denial of a state funded investigator violated her rights to equal protection. Appellant asserts the trial court's ruling created an "unreasoned distinction between Appellant's rights and those of her co-defendant, who had the assistance of three investigators working for the Oklahoma County Public Defenders' Office." (Appellant's brief, pg. 75). Appellant's argument does not involve suspect classifications which touch upon fundamental interests, therefore, her claim will be analyzed under the "rational relationship test." *State v. Pratt,* 816 P.2d 1149, 1152 (Okl.Cr.1991). This standard merely requires that distinctions drawn by a challenged statute or ruling bear some rational relationship to a conceivable legitimate State interest. *City of New Orleans v. Duke,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976); *Callaway v. City of Edmond,* 791 P.2d 104, 106 (Okl.Cr. 1990).

The State has a legitimate interest in using public funds properly and in requiring indigent criminal defendants to make a certain showing of need before public funds are entrusted to their use. By requiring Appellant to make that showing of need, the trial court's ruling bore a rational relationship to this legitimate state interest. As set forth in our initial discussion of the provisions of 22 O.S.Supp.1985, § 464(B), Appellant was treated as any other indigent defendant requesting a state funded expert. The comparison with co-defendant Bryson is improper, as no showing has been made either to Appellant's need for an investigator, or to what, if any access, co-defendant Bryson had to investigators utilized by the Oklahoma County Public Defenders Office. Moreover, Bryson made no request for a state funded investigator. Accordingly, we find no equal protection violation.

## C.

◼ In the first sub-proposition to her eighth assignment of error, Appellant contends that she was denied a fair trial by extensive pre-trial publicity. She asserts that the local newspaper coverage was particularly intense, as the decedent was a long time employee of the paper. Appellant filed a motion for change of venue due to the pretrial publicity. Three (3) supporting affidavits from citizens of Oklahoma County indicated the publicity would prevent Appellant from receiving a fair trial. The motion was overruled on the grounds that the issue could be adequately tested during voir dire.

◼ The defendant carries the burden of persuasion in overcoming the presumption that she cannot get a fair and impartial trial. *Hammons v. State,* 560 P.2d 1024 (Okl.Cr. 1977). Prejudice from exposure to adverse pretrial publicity must be shown. *Robison v. State,* 677 P.2d 1080, 1083 (Okl.Cr.1984), *cert. denied* 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984). It must be shown by clear and convincing evidence that jurors were specifically exposed to the publicity and that he was thereby prejudiced. *Id.*

◼ Appellant has not overcome the presumption that she could receive a fair trial. While the news accounts of the crime and trial included in Appellant's brief are not

flattering, they are factual and not invidious or inflammatory in nature. *Beck v. Washington,* 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). As this Court stated in *Rojem v. State,* 753 P.2d 359, 365 (Okl.Cr.1988), mere exposure to publicity surrounding a criminal case simply does not demonstrate prejudice. Media coverage extends to most homicides, particularly when prosecuted as capital cases. As stated many times by this Court, a defendant is not entitled to jurors ignorant of his case. *Woolridge v. State,* 659 P.2d 943 (Okl. Cr.1983). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented." *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751, 756 (1961). A review of voir dire shows that each of the jurors sitting in Appellant's case was thoroughly examined as to the effect the pre-trial publicity may have had on them. Each stated they could set aside any media coverage, pre-conceived ideas and personal opinions and base their verdicts on the evidence presented at trial. We find that the jurors were able to fairly judge the evidence at trial and were not improperly influenced by any pre-trial publicity. *See Dutton v. State,* 674 P.2d 1134 (Okl.Cr.1984) *modified on other grounds,* 812 F.2d 593 (10th Cir.1987).

### JURY SELECTION ISSUES

#### A.

■ Appellant argues in her second assignment of error that the trial court erred in refusing to grant each co-defendant the full complement of peremptory challenges during voir dire. She asserts that 22 O.S.1981, § 655, absolutely requires that a defendant be permitted to exercise the full complement of nine (9) peremptory challenges when the defenses of the jointly tried defendants are inconsistent. The State responds by asserting that the defendants did not have inconsistent defenses during the first stage of trial and therefore, they were properly required to share the peremptory challenges. Relying on *Neill v. State,* the State argues that when the defenses are inconsistent only as to culpability or punishment, and not guilt or innocence, the defendants may be properly required to share their peremptory challenges.

The resolution of this issue is solely predicated upon interpretation of state statute. Title 22 O.S.1981, § 655, provides in pertinent part:

In all criminal cases the prosecution and the defendant are each entitled to the following peremptory challenges: Provided, that if two or more defendants are tried jointly they shall join in their challenges; provided, that when two or more defendants have inconsistent defenses they shall be granted separate challenges for each defendant as hereinafter set forth.

First. In prosecutions for first degree murder, nine jurors each.

The defenses presented by Appellant and her co-defendant were neither mutually antagonistic nor inconsistent as to the guilt stage. The only inconsistencies arose during the presentation of evidence to mitigate punishment during the second stage of trial. However, evidence presented in mitigation of punishment during the second stage of a bifurcated trial is not a legal defense. "Legal defenses are matters which go to the legal exoneration of guilt or evidence which may reduce the charge to a lesser included offense." *Kinsey v. State,* 798 P.2d 630, 633 (Okl.Cr.1990). This does not include penalty phase mitigation evidence presented to the trier of fact for its use in determining appropriate punishment. *See Lafevers v. State,* 819 P.2d 1362, 1371 (Okl.Cr.1991) (Lumpkin, V.P.J. concur in part/dissent in part).

■ Therefore, what was implicitly stated in *Neill* is now made explicit: the requirement of separate peremptory challenges under 22 O.S.1981, § 655, applies only to legal defenses presented during the guilt/innocence stage of trial. Where the inconsistency goes only to the level of culpability in the punishment stage of a bifurcated trial, Section 655 is not applicable. While Section 655 does not specifically address the issue of mitigation evidence, this interpretation is consistent with the Legislative intent of the statute, for co-defendants tried together to share peremptory challenges during voir dire. Any other interpretation would obviate the language of the statute by finding that co-defendants tried together would always be

provided nine separate challenges. See *Owens v. State*, 665 P.2d 832 (Okl.Cr.1983) (statutes are to be interpreted to produce a reasonable result and to promote, rather than to defeat, the general purpose and policy of the law).[5] Any other interpretation would preclude joint trials in all cases wherein co-defendants were charged with an offense which allowed mitigation evidence in the punishment stage of trial.

### B.

In her next three assignments of error, Appellant challenges the court's ruling on six (6) specific potential jurors. In her third assignment of error, Appellant argues that the trial court erred in failing to excuse for cause prospective jurors Pouder and Mess. Appellant asserts that the clear preference for guilt and the death penalty expressed by these two prospective jurors required their removal from the jury for cause and the court's failure to so excuse them forced Appellant to accept jurors who were unacceptable to her but could not be removed, as she had used all of her peremptory challenges.

 The manner and extent of voir dire examination rests largely in the sound discretion of the trial judge. *Banks v. State*, 701 P.2d 418, 423 (Okl.Cr.1985). A defendant has no vested right to have a particular juror out of a panel. *Id.* The right to challenge any juror for a particular cause is a statutory right which may be waived by the defendant. *Allen v. State*, 70 Okl.Cr. 143, 105 P.2d 450, 454 (Okl.Cr.1940). Whether or not a juror should be excused is within the discretion of the trial court. *Bickerstaff v. State*, 446 P.2d 73, 76 (Okl.Cr.1968). Further, as the trial court personally observes the jurors and their responses, this Court will not disturb its decision absent an abuse of discretion. *Rojem v. State*, 753 P.2d at 363.

 Any error in the court's ruling on Mr. Pouder has been waived for consideration on appeal. The record shows that Appellant passed Mr. Pouder for cause. (Tr.

226) This Court remains committed to the general rule that a timely objection must be made on the record to preserve any alleged error for appellate review. *Wood v. State*, 748 P.2d 523, 525 (Okl.Cr.1987). Appellant's failure to timely raise any objection she may have had to Mr. Pouder's service on the jury effectively prevented the trial court from implementing any corrective measures. *See Davis v. State*, 753 P.2d 388, 392 (Okl.Cr. 1988) (a timely objection brings the alleged error to the attention of the trial court and provides an opportunity to correct the error at trial.)

 As for potential juror Ms. Mess, Appellant initially passed her for cause also, but joined in the co-defendant's subsequent challenge for cause. Therefore, any error has been properly preserved for appellate review. In *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), the Supreme Court held that the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." at 424, 105 S.Ct. at 852. The Court further stated that a juror's bias need not be proved with "unmistakable clarity;" neither must the juror express an intention to vote against the death penalty "automatically." *Id.* We will look to the entirety of the juror's voir dire examination to determine if the trial court properly denied the challenge for cause. *See Davis v. State*, 665 P.2d 1186, 1194 (Okl.Cr.1983), *cert. denied* 464 U.S. 865, 104 S.Ct. 203, 78 L.Ed.2d 177 (1983).

 Ms. Mess was thoroughly questioned by the court and counsel for both defendants. Appellant directs our attention to portions of that voir dire wherein Ms. Mess indicated that if someone was guilty, they should "pay for it", that "they should be punished to the fullest", and that the death penalty was the harshest punishment available. The responses, taken in isolation, would appear to

---

**5.** See also *City of Norman v. Liddell*, 596 P.2d 879, 882 (Okl.1979); *Wooten v. Hall*, 442 P.2d 334, 336 (Okl.1968) (statutory construction which would lead to an absurdity will be avoided if this can be done without violating the evident legislative intent).

be the opinion of someone irrevocably committed to finding the defendants guilty and imposing the death penalty. However, when read in context with the remainder of the voir dire of Ms. Mess, she also indicated she was going to listen to the evidence and draw her own conclusions because she could not "accuse somebody of something until I know for sure", and that she was not automatically predisposed to a particular punishment. In overruling the challenge for cause, the court noted that Ms. Mess had indicated that when she first read about the murder in the newspaper she thought those who committed the offense should be seriously punished. However, when informed by the court as to the procedures and law to be followed in arriving at a verdict, Ms. Mess made it very clear she would listen to all the evidence and would consider all available punishment options. (Tr. 521)

The voir dire of Ms. Mess went far beyond questions of general fairness and "follow the law", questioning found inadequate in *Morgan v. Illinois*, 504 U.S. ——, ——, 112 S.Ct. 2222, 2232–33, 119 L.Ed.2d 492, 506 (1992). The record reveals that Ms. Mess met the requirements of a fair and impartial juror and that the trial court properly overruled the challenges for cause. Further, as Appellant has failed to show that the trial court erred failing to excuse venire persons Pouder and Mess for cause, she has failed to show that she was unfairly forced to use peremptory challenges to remove them from the panel.

### C.

In her fourth assignment of error, Appellant contends the trial court erred in failing to excuse for cause potential juror Hicks as she indicated she had attended the decedent's funeral. Any error in the failure to excuse Ms. Hicks for cause has been waived by Appellant's failure to raise a timely objection at trial. *Davis v. State*, 753 P.2d at 392. Appellant passed Hicks for cause. Therefore, this assignment of error is denied.

### D.

Appellant contends in her fifth assignment of error that three potential jurors were improperly excused for cause. The first venire person challenged, Mr. Vaughn, stated that he could not consider and agree to a verdict which imposed the death penalty. In further inquiry by the court and defense counsel, Mr. Vaughn indicated he could follow the law but could not give equal consideration to the State's case and the imposition of the death penalty, that he could "sit down and consider it, but in the back of my mind, it would always be a negative", and that the State could not persuade him to vote for the death penalty. Mr. Vaughn was excused for cause by the trial court, over a defense objection.

Looking to the entirety of Mr. Vaughn's voir dire, we find his answers showed that he was irrevocably committed to vote against the death penalty regardless of the law and that his views about capital punishment would have prevented or substantially impaired his performance as a juror in accordance with his instructions and oath. See *Wainwright v. Witt*, 469 U.S. at 424, 105 S.Ct. at 852. Therefore, the trial court properly dismissed him for cause.

Venire person Morgan stated that her husband was serving prison sentences for rape and robbery, that she was concerned for her husband's well being while in prison, and that she would try to be fair but she thought she would be overly sympathetic to the defendants. Throughout voir dire Mrs. Morgan continually expressed her doubts as to her ability to be impartial based upon her personal experiences. Accordingly, the trial court properly overruled Appellant's objection and excused Mrs. Morgan for cause.

Venire person Maciula indicated that due to religious beliefs, he would need to talk with church officials before considering the death penalty. Upon further inquiry, Mr. Maciula stated he could consider the death penalty as punishment but he could not actually impose it in a particular case. Appellant objected to this inquiry and argued the court should ask the questions as dictated by *Wainwright v. Witt*. The court permitted counsel to so question the venire person. Mr. Maciula stated that he could give the defendants a fair trial as to guilt or innocence but he could not consider all three punish-

ments. Mr. Maciula's views were such that they would prevent him from being a fair and impartial juror. Therefore the trial court properly excused him for cause.

### E.

■ In her sixth assignment of error, Appellant contends the trial court improperly restricted her right to voir dire potential jurors on what they could and could not consider as specific mitigating factors. Initially, we must note that all references to the record cited by Appellant are to inquiries propounded by counsel for co-defendant Bryson as to what mitigating evidence he could present to persuade the jury. There is no evidence that Appellant's voir dire of the panel was restricted in any way. Further, an argument similar to Appellant's was rejected by this Court in *Sellers v. State*, 809 P.2d 676, 682–683 (Okl.Cr.1991). In *Sellers*, the appellant complained about the trial court's failure to permit inquiries into youth as a mitigating factor. We stated:

> While it is proper to inquire whether a prospective juror is willing to consider the alternate punishments prescribed for First Degree Murder, we find no abuse of discretion in refusing to permit inquiry into views on particular mitigating circumstances. To permit such questioning would make voir dire an open forum for discussion of any circumstances accompanying the murder, both mitigating and aggravating. The great potential to improperly influence the jury weighs strongly in support of the trial court's ruling in this case.

> While a criminal defendant in a State court is guaranteed an impartial jury by the Sixth Amendment, (cite omitted) the Constitution does not always entitle a defendant to propound questions during voir dire specifically directed to matters that conceivably might prejudice veniremen against him. (cite omitted) ... the State in this case was able to fulfill its obligation to impanel an impartial jury with less than

a specific inquiry into appellant's area of concern, and this argument must fail.

In the present case, the trial court properly limited co-counsel's open ended inquiries into possible mitigating evidence. As in *Sellers*, an impartial jury was seated without the inquiries sought by Appellant. Accordingly, this assignment of error is denied.

### FIRST STAGE TRIAL ISSUES

#### A.

■ In a sub-proposition to Appellant's first assignment of error, she argues she was denied a fair trial by the improper admission of hearsay statements of co-defendant Bryson through the testimony of Homicide Investigator Gibson, and Bryson's friends Terry Norman, Derrick Jones, Michael Kendrick and inmate Ricky Dunn. Appellant asserts that on cross-examination, Homicide Investigator Gibson testified that during an interview conducted approximately four (4) days after the murder, Bryson told him Appellant had said she was physically abused by the decedent, that Bryson's relationship with Appellant had been going on for a year and a half and that their relationship was sexual. Appellant argues this testimony directly implicated her as "Bryson's manipulator and attempted to establish his defense that he killed Mr. Plantz in a heat of passion because he was abusing his wife." (Appellant's brief, pg. 17)

■ Only the inquiry into the sexual nature of the relationship brought an objection from Appellant. When alleged hearsay is admitted without objection, the statements may be considered as though they are admissible. *Wilson v. State*, 554 P.2d 806 (Okl.Cr. 1976). Contrary to Appellant's argument, we find none of these statements are the type prohibited in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)[6]. The statements neither directly inculpated Appellant nor exculpated codefendant Bryson regarding the crimes charged. Further, the statements do not relate to the crime itself. The Confrontation Clause guar-

---

6. In *Bruton,* the United States Supreme Court held that a defendant was deprived of his rights under the Confrontation Clause when a non-

testifying co-defendant's confession naming the defendant as a participant in the criminal offense is introduced in their joint trial.

antees the accused the right to be confronted with the witnesses against her. These statements did not make co-defendant Bryson a witness against Appellant under the *Bruton* analysis. Therefore, Appellant was not denied her constitutional right of confrontation by the admission of Detective Gibson's testimony.

The majority of statements related through the testimony of Norman, Jones, Kendrick and Dunn, now contested on appeal concerned Bryson's relationship with Appellant and his participation in the planning and commission of the murder and arson. These statements do not mention Appellant or her role in the offenses. There are two exceptions, Norman's testimony that Bryson told him Appellant "wanted to do the thing" (Tr. 1109–1110) and Kendrick's testimony that Bryson told him Appellant cleaned the baseball bats and put them up after the murder. (Tr. 1204) These statements were improperly admitted against Appellant. They are hearsay for which no exception exists. Further, they are the type of statement prohibited in *Bruton* as they directly incriminate Appellant.

However, the admission of the two statements does not require reversal in this case. Initially, none of these statements were met with a contemporaneous objection by defense counsel. Therefore, we treat them as admissible. *Mann v. State,* 749 P.2d 1151, 1158 (Okl.Cr.1988). Further, a harmless error analysis is applicable to a *"Bruton* error". *Parker v. Randolph,* 442 U.S. 62, 70–71, 99 S.Ct. 2132, 2138–39, 60 L.Ed.2d 713, 722 (1979). In *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), the Supreme Court held that a constitutional error can be held harmless only if the reviewing court is "able to declare a belief that it was harmless beyond a reasonable doubt." In the present case, we find no reasonable probability that the improperly admitted statements might have contributed to the conviction. *Id.* at 386 U.S. 23, at 87

S.Ct. 827–28 quoting *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). Appellant was directly linked to the offenses by her own statements made in furtherance of the conspiracy as testified to by Clinton McKimble. See 12 O.S.1981, § 2801(4)(b)(5),[7] and by statements concerning plans to kill the decedent as testified to by Michael Kendrick. See 12 O.S.1981, § 2801(4)(b)(1).[8] The improperly admitted statements were merely cumulative of other overwhelming and largely uncontroverted evidence of Appellant's role in the conspiracy and murder properly before the jury. Thus, any error was harmless beyond a reasonable doubt.

### SENTENCING STAGE ISSUES

#### A.

In her ninth assignment of error, Appellant challenges the aggravating circumstance of "especially heinous, atrocious or cruel" arguing that it is facially invalid as it failed to adequately channel the jury's discretion. This argument has been repeatedly addressed and rejected by this Court. *Robedeaux v. State,* 866 P.2d 417 (Okl.Cr.1993); *Romano v. State,* 847 P.2d at 386; *Boltz v. State,* 806 P.2d 1117 (Okl.Cr.1991); *Moore v. State,* 788 P.2d 387, 401–402 (Okl.Cr.1990); *Fox v. State,* 779 P.2d 562, 576 (Okl.Cr.1989); *Fowler v. State,* 779 P.2d 580, 588 (Okl.Cr. 1989); *Nguyen v. State,* 769 P.2d 167, 174 (Okl.Cr.1988); *Rojem v. State,* 753 P.2d at 369; *Hale v. State,* 750 P.2d 130, 142 (Okl.Cr. 1988); *Mann v. State,* 749 P.2d 1151, 1160 (Okl.Cr.1988). The jury instruction given in the present case, both paragraphs of Oklahoma Uniform Jury Instructions–Criminal No. 436, embodies the limitations discussed in the above cases which the sentencer must consider in the application and finding of this particular aggravating circumstance. Accordingly, we find that this particular aggravating circumstance was applied in a constitutional manner in the present case.

---

**7.** 12 O.S. 1981, § 2801(4)(b)(5) provides that a statement is not hearsay if the statement is offered against a party and is a statement by a coconspirator of a party made during the course and in furtherance of the conspiracy.

**8.** 12 O.S. 1981, § 2801(4)(b)(1) provides that a statement is not hearsay if the statement is offered against a party and it is the party's own statement.

### B.

In her tenth assignment of error, Appellant contends the evidence was insufficient to support the aggravating circumstance "murder for remuneration". Title 21 O.S.1981, § 701.12(3), defines this aggravator as follows:

The person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration.

The term "remuneration" was defined for the jury to mean "pay an equivalent for, that is to reimburse for a service, loss, or expense. It is also used to connote payment for services performed." (O.R. 673) Appellant argues that this aggravator does not apply to her as she was neither paid for a service performed nor did she pay anyone for a service performed.

The traditional application for this aggravating circumstance has been where a defendant has been hired or has hired another person to perform an act of murder. *Johnson v. State*, 665 P.2d 815, 824 (Okl.Cr.1982); *Boutwell v. State*, 659 P.2d 322, 328 (Okl.Cr.1983). However, murder for remuneration has also been applied to killings motivated primarily to obtain proceeds from an insurance policy. *Johnson*, 665 P.2d at 824. *See also O'Bryan v. State*, 591 S.W.2d 464, 480 (Tex.Cr.1979). Evidence in the present case showed that the crime was motivated by financial gain. It was committed after the opportunity of weeks of reflection. It was not a crime of passion, nor was the murder committed as an afterthought while Appellant was in the course of committing another felony offense, such as robbery or burglary. The fact that Appellant was apprehended before she could actually collect the money does not obviate this aggravating circumstance.

Appellant further argues that the only evidence supporting this aggravator came from the unreliable testimony of Clinton McKimble. Appellant contends that a rational juror would have concluded that McKimble was trying to inculpate Appellant because he and Bryson had already confessed to being the ones who killed the decedent. This Court has repeatedly held that it is within the exclusive province of the jury to determine the weight and credibility to be given to the testimony of a witness, reconcile the testimony concerning the motives of the witnesses, weigh the evidence, and resolve conflicts in that evidence. *Roldan v. State*, 762 P.2d 285, 286 (Okl.Cr.1988); *Allen v. State*, 734 P.2d 1304, 1307 (Okl.Cr.1987); *Coleman v. State*, 600 P.2d 351 (Okl.Cr.1979). Such a determination will not be disturbed on appeal. *Yell v. State*, 694 P.2d 946, 948 (Okl.Cr.1985). Here, the jury heard McKimble's testimony, including the challenges to his credibility levied by defense counsel, and chose to believe him. This is not unreasonable as his version of events, particularly the claim that Appellant was eager to collect on the life insurance proceeds, was corroborated by several other witnesses. Accordingly, we find that the evidence, both direct and circumstantial, was sufficient to support the aggravating circumstance of murder for remuneration.

### C.

Appellant contends in her eleventh assignment of error, that the trial court's failure to inform the jury that its findings regarding mitigating circumstances did not have to be unanimous violated her rights to a fair sentencing proceeding. This same argument was addressed and rejected in *Pickens v. State*, 850 P.2d 328, 339–340 (Okl.Cr.1993). Instructions identical to those in *Pickens* were given in the present case. Therefore, we find no need to revisit the issue.

### D.

In her twelfth assignment of error, Appellant finds error in the failure to give an instruction that the jury had the option to return a life sentence regardless of its findings respecting aggravating and mitigating circumstances. This issue was also addressed and rejected in *Pickens*, 850 P.2d at 339.

### MANDATORY SENTENCE REVIEW

Pursuant to 21 O.S.Supp.1987, § 701.13(C), we must determine (1) whether the sentence

of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.1981, § 701.12. This is also Appellant's eighth assignment of error. She argues that the death sentence in her case was imposed under the influence of passion, prejudice and other arbitrary factors as illustrated by the extensive pre-trial publicity surrounding her trial, the defense and trial strategy of co-defendant Bryson, and the trial court's management of voir dire. These allegations of error have all been previously addressed and rejected in this opinion. Therefore, we turn to our statutory review. The jury found the existence of two (2) aggravating circumstances; 1) that the murder was committed for remuneration or the promise of remuneration; and 2) that the murder was especially heinous, atrocious or cruel.

 As discussed previously, sufficient evidence was presented to support the aggravator of murder for remuneration. A review of the record also shows sufficient evidence to support the finding of the aggravating circumstance of "especially heinous, atrocious or cruel". Evidence supporting this aggravator requires proof that the death was preceded by torture or serious physical abuse. *Revilla v. State*, 65 OBJ 1491, —— P.2d —— (Okl.Cr. April 22, 1994); *Stouffer v. State*, 742 P.2d 562, 563 (Okl.Cr.1987). *See also Fox v. State*, 779 P.2d at 576; *Rojem v. State*, 753 P.2d at 369. After making such a determination, we may not only consider the actual physical suffering of the victim, but the attitude of the killer and the pitiless nature of the crime. *Thomas v. State*, 811 P.2d 1337, 1349 (Okl.Cr.1991); *Nuckols v. State*, 805 P.2d 672, 675 (Okl.Cr.1991).

At Appellant's direction and with baseball bats provided by her, the decedent was seriously beaten. The first blow caused him to cry out for Appellant. She remained in her bedroom while the beating took place in the adjacent living room. Appellant observed the moaning decedent laying against the pickup and commented that his injuries did not look like an accident. She then directed her co-defendants to burn the decedent. Appellant provided her car for the men to re-

turn in after the burning. Medical testimony showed that the decedent was alive and conscious at some point during the fire. While the medical examiner testified it was not possible to determine exactly how long a period of time the decedent was conscious, the physical evidence supports the conclusion that the decedent was alive and attempted to exit the vehicle before succumbing to the smoke and fire. The serious physical abuse suffered by the decedent and the attitude of the Appellant, clearly support the jury's finding that the murder was "especially heinous, atrocious or cruel".

 Mitigating evidence was presented by Appellant in the form of four (4) witnesses who testified to the following: that Appellant is twenty-eight (28) years old; she has two (2) minor children who love her and with whom she has a close relationship; she has no prior criminal record, and she has parents and two (2) sisters who love and care for her. This evidence was summarized into six (6) factors and submitted to the jury for their consideration as mitigating evidence.

Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiate and appropriate. Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.Supp. 1987, § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence. Accordingly, finding no error warranting reversal or modification, the judgment and sentences for First Degree Murder, Third Degree Arson, Solicitation to Commit Murder and Conspiracy to Commit Murder are **AFFIRMED.**

JOHNSON, V.P.J., and LANE and STRUBHAR, JJ., *concur.*

CHAPEL, J., dissents.

CHAPEL, Judge, dissenting:

I dissent in this case for the reasons I have set forth in *Bryson v. State*, 876 P.2d 240.