2009 OK CR 1

**Jared William JONES, Appellant**

v.

**The STATE of Oklahoma, Appellee.**

**No. D–2005–599.**

Court of Criminal Appeals of Oklahoma.

Jan. 21, 2009.

C. Thomas Kite, James T. Rowan, Joseph Ashbaker, Angela J. Smith, Oklahoma City, OK, counsel for appellant at trial.

C. Wesley Lane II, District Attorney, Cassandra Williams, Sandra Elliott, Assistant District Attorneys, Oklahoma City, OK, counsel for the State at trial.

William H. Luker, Okla. Indigent Defense System, Norman, OK, counsel for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer J. Dickson, Assistant Attorney General, Oklahoma City, OK, Counsel for the State on appeal.

## OPINION

LUMPKIN, Judge.

¶ 1 Appellant Jared William Jones was tried by jury and convicted of three counts of First Degree Malice Murder (Counts I, II, and III) (21 O.S.2001, § 701.7(A)), and two counts of Shooting with Intent to Kill (Counts IV and V) (21 O.S.2001, § 652), Case No. CF–2003–2046, in the District Court of Oklahoma County. In Count I, the murder of Pamela Karr, the jury found the presence of one aggravating circumstance, that the defendant knowingly created a great risk of death to more than one person, and set punishment at death. In Counts II and III, the murders of Brian Galindo and Joel Platt, respectively, the jury found the presence of two aggravating circumstances: (1) that the defendant knowingly created a great risk of death to more than one person and (2) that the murder was especially heinous, atrocious, or cruel. The jury set punishment for each count at death. Regarding Counts IV and V, the shootings of Tara Platt and Tara Johns, respectively, the jury set punishment at life imprisonment on each count. The trial judge sentenced Appellant in accordance with the jury's determination and ordered all sentences to run consecutively. Appellant now appeals his convictions and sentences.[1]

¶ 2 Appellant was convicted of shooting Joel Platt, Brian Galindo, Pam Karr, Tara

---

1. Appellant's Petition in Error was filed in this Court August 19, 2005. His brief was filed October 23, 2006. The State's brief was filed February 20, 2007. Appellant's reply brief was filed March 12, 2007. The case was submitted to the Court March 1, 2007. Oral arguments were held July 22, 2008.

Platt and Tara Johns. Only the last two survived the shootings. The shootings were connected to Appellant's relationship with Carla Phillips, his live-in girlfriend. Appellant and Phillips lived down the street from the Platt residence, where brother and sister, Joel and Tara lived and where the crime in question took place. Eight adults and two children were in the Platts' home at the time of the shootings. Five of the adults testified as witnesses for the State and Appellant testified in his own behalf. While certain details of the circumstances leading up to and including the shootings vary among the witnesses, the State witnesses essentially testified to the following.

¶ 3 On the night of April 11, 2003, Ms. Phillips and her young son went to the Platt residence, while Appellant went to a car show. Before going to the show, Appellant and his friends drank beer and wine and smoked marijuana. Meanwhile, at the Platt residence, Ms. Phillips had joined Tara Platt, Tara Johns, and 2 other women in visiting, playing video games, drinking beer and smoking marijuana. While there were several children at the house early in the evening, by the time of the fatal confrontation, only Tara Platt's two children remained in the house, asleep in their beds. During the evening and into the early morning hours, Ms. Phillips spoke with Appellant several times over the phone. Their conversations included some amount of verbal sparring. After a conversation at approximately 2:36 a.m., April 12, Appellant headed to the Platt residence, armed with two .45 caliber guns in his pockets.[2]

¶ 4 By this time, Joel Platt, Brian Galindo, Pam Karr, and Ramone Hernandez were at the Platt residence, having been at nightclubs earlier in the evening. Tara Platt was at the front door when she saw Appellant's car drive up. She opened her front door to see Appellant get out of his car, walk to her house and inform her he had come to party with them. He entered the living room and asked for Ms. Phillips. Ms. Platt indicated Ms. Phillips was in the back bedroom and

she would get her for Appellant. To get to the back bedroom, Ms. Platt had to walk through the bedroom where her seven year old son was sleeping. Unbeknownst to Ms. Platt, Appellant followed her. He reached around her and pushed open to the door to the back bedroom. Angry that Appellant had followed her into her son's room, she shoved him backwards, causing him to fall over a child size chair.

¶ 5 The ensuing argument over why Appellant had forced open the door and why Ms. Platt had pushed him, brought Joel Platt and Brian Galindo out from the bedroom. Joel Platt and Galindo tried to calm Appellant down and remove him from the child's bedroom either by placing him between the two of them with each grabbing an arm, or by Joel Platt placing his arm around Appellant's shoulder and pushing him towards the door. Appellant resisted their efforts to remove him from the room, saying he needed to talk with Ms. Phillips. While coming through the doorway from the little boy's room into the living room, an intoxicated Joel Platt fell. He got up and took a "drunken swing" at Appellant, but missed him. Others in the house began telling, with some shouting, Appellant to leave.

¶ 6 Despite continued efforts to get Appellant to leave, Appellant, Joel Platt, and Galindo ended up in the front bedroom which Ms. Platt shared with her two year old daughter. Ms. Platt told the men to leave and climbed onto her sleeping daughter's bed and covered her ears. Backed into a corner, Appellant took out a gun, pointed it at Joel Platt's eyes, and announced he had "two .45's." Joel turned to get Ms. Phillips. She entered the room, briefly spoke with Appellant, then left the house. At the sight of the gun, Galindo put his hands in the air and told Appellant, "we've got children in the house, we don't need this, put the gun away." Appellant fired 4 times at Galindo, striking him in the chest. Galindo fell in the middle of the bedroom floor. Pam Karr rushed in and knelt by his side. Appellant shot her twice in the head. Tara Platt put her head down and

---

2. Appellant claimed this was standard practice, as he normally carried guns in his neighborhood for protection. Also, he did not want to leave the guns at his house with his friends, who were hanging about and, ironically, not to be trusted with guns.

covered her daughter. Appellant turned toward her and shot her in the shoulder and thumb.

¶ 7 Tara Johns was standing in the living room when she saw Appellant shoot Galindo. She grabbed a phone to call 911 and turned to see Appellant facing her with a gun in each hand. She also saw Joel Platt facing Appellant. Appellant shot Tara Johns in the hip. She held on to the phone waiting for the dispatcher to pick up. Appellant then shot her in the head. She was able to hold on until the dispatcher answered, then she fell to the floor. The 911 call recorded the rest of the events at the house. Appellant fired two more shots and struck Joel Platt in the back of his head. He fired three more shots into Tara Johns as she lay on the ground.

¶ 8 After having been shot Tara Platt remained in her daughter's bedroom. She heard Appellant's screams and seven more gunshots. She then heard him leave through the front door. She picked up her daughter and started out of the bedroom. However, Appellant met her at the door and forced her back into the house, cornering her near the bathroom door, which adjoined the bedrooms. Attempting to protect her daughter, Tara Platt stood in front of her and begged Appellant not to shoot them. Appellant waved his guns in her face and mockingly said, "don't shoot me." By this time, Appellant's guns were empty. Appellant ran out of the house and Tara Platt ran to look for a phone, unaware that Tara Johns had already called 911.

¶ 9 The State's witnesses all testified that once the shooting started the situation was chaotic. However, they all consistently stated the only physical contact with Appellant was Joel Platt and Galindo attempting to push him out the door. The witnesses testified there was no fighting and no one hit, kick, punched or even threatened Appellant.

¶ 10 By contrast, Appellant testified that during the altercation he felt trapped and described the group in the house as a "crazed mob" that was "tweaked out" on "crank". Appellant testified he was familiar with the drug from previous experience with his brother and his brother's friends, and that he recognized the smell and the crazy behavior its users exhibited.

¶ 11 Appellant said the group used profanity and unnecessary force to remove him from the house, slammed him against a wall, restrained his arms and ultimately choked him. Appellant claimed that as he reached for the guns inside the little girl's bedroom, Joel Platt grabbed him by his throat and began choking, possibly grabbing one of his hands in the process. Appellant claimed he pulled a pistol from his left pocket, but Galindo grabbed that arm. As he was about to black out, he pulled the other pistol from his right pocket and hit Joel with it. According to Appellant, this did not stop the choking. As he and Galindo struggled with the pistol, it went off and fell to the floor. Appellant said Galindo grabbed the gun, but Appellant shot him with the other pistol. Someone grabbed the first pistol and moved toward Appellant, so he shot her. Appellant said he then made his way to the living room, but found Joel coming toward him. He shot Joel and continued shooting as he ran out the front door, stating "they're going to kill me." Appellant offered no explanation for the shootings of Tara Platt and Tara Johns, but said he did not go to the Platt residence with the intention of killing anyone.

¶ 12 Other facts will be discussed as we address Appellant's thirteen propositions of error.

### VOIR DIRE ISSUES

¶ 13 In proposition five, Appellant claims *voir dire* errors violated his right to a fair and impartial jury under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article 2, Sections 7, 9, 19, and 20 of Oklahoma's Constitution. Appellant's attack is twofold. He first claims the trial judge erred by removing seven potential jurors (and two potential alternates) for cause over defense objection and without proper questioning, i.e., before it was adequately established that the jurors could not follow the law and consider the death penalty. Secondly, Appellant claims two prospective jurors were not removed for cause, although they should have been, thus requiring

Appellant to use and lose two of his peremptory challenges.

¶ 14 "The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Williams v. State,* 2001 OK CR 9, ¶ 10, 22 P.3d 702, 709, *quoting Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). *See also Eizember v. State,* 2007 OK CR 29, ¶ 41, 164 P.3d 208, 221. A juror's bias need not be proved with unmistakable clarity; neither must the juror express an intention to vote against the death penalty automatically. *Williams,* 2001 OK CR 9, ¶ 10, 22 P.3d at 710. Determination of a juror's bias often cannot be reduced to a question and answer session. *Id.* Despite the lack of clarity in the written record, there are situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. *Id.* This Court will look to the entirety of the juror's *voir dire* examination to determine if the trial court properly excused the juror for cause. *Id.* As the trial court personally observes the jurors and their responses, this Court will not disturb its decision absent an abuse of discretion. *Id.*

¶ 15 In the present case, three of the prospective jurors, R.L., T.M., and C.D. were excused for cause *sua sponte* after questioning solely by the trial court. Defense counsel's objections and requests to attempt to rehabilitate the potential jurors through further *voir dire* questioning were denied. Relying on *Mitchell v. State,* 2006 OK CR 20, 136 P.3d 671, Appellant asserts the trial court abused its discretion in denying defense counsel's requests for an opportunity to *voir dire* the potential jurors further and in excusing them for cause so abruptly.

¶ 16 In *Mitchell,* this Court held that as the last-recorded answers of the potential jurors excused for cause indicated that they were not able to consider the death penalty, the trial court did not err when it struck them for cause. However, as the trial court failed to ask the appropriate clarifying question under our uniform jury instructions about the potential jurors' willingness to consider the death penalty despite their objections to it, the trial court abused its discretion in not allowing defense counsel an opportunity to further question the potential jurors.[3]

¶ 17 In its *voir dire* examinations of R.L., T.M., and C.D., the trial court followed the questions set out in Oklahoma Uniform Jury Instruction (OUJI–CR 2d) 1–5. As to R.L. and C.D., the court specifically asked prospective jurors question number 12, alternative 2 as noted in *Mitchell.* The last-recorded answers of these potential jurors excused for cause indicated that they were not able to consider the death penalty. Therefore, the trial court did not abuse its discretion in striking them for cause without allowing defense counsel an opportunity to further question the potential jurors.

¶ 18 As for prospective juror T.M., the uniform questions were followed except question number 12 alternative 2 was not asked. The last-recorded answers of T.M. indicated he was not able to consider the death penalty. The trial court's failure to permit defense counsel an attempt at rehabilitation was not abuse of discretion in light of defense counsel's admission that the prospective juror's responses were "fairly unequivocal".

¶ 19 The remaining prospective jurors ultimately excused for cause initially informed the court they were able to consider all three punishments and the prosecution was allowed to *voir dire.* Four of these, A.H., D.N., L.W., and S.H. were subsequent-

---

3. *See* OUJI–CR 2d (Supp.2000) 1–5, Question 12, Alternate 2 (for prospective juror with reservations about death penalty) ("If you found beyond a reasonable doubt that the defendant was guilty of murder in the first degree and if under the evidence, facts and circumstances of the case the law would permit you to consider a sentence of death, are your reservations about the penalty of death so strong that regardless of the law, the facts and circumstances of the case, you would not impose the penalty of death?"). *Mitchell,* 2006 OK CR 20, ¶¶ 43–44, 136 P.3d at 691–692, fn. 100 & 103.

ly excused *sua sponte* by the court and two, G.M. and J.W., were excused at the State's request.[4] In each instance defense counsel's objection and request to further question the prospective jurors was denied.

¶ 20 The record shows that under questioning by the prosecutor, the answers of these prospective jurors became equivocal. The prospective jurors all variously commented that having thought about the issue overnight, they had strong reservations about their abilities to return a verdict of death if guilt were established. In most cases, the prosecutor asked a series of probing questions on the issue, and the answers to those questions demonstrated the potential jurors were deeply conflicted, extremely pessimistic about their ability to fairly consider a death sentence, or unable to vote for the death penalty. None of these jurors indicated that all three punishment options would be fairly considered. The jurors' responses went beyond "general objections to the death penalty" and "expressed religious conscientious scruples". *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968). As the trial court was able to directly observe and evaluate these potential jurors and their responses, we find no abuse of discretion in their dismissal for cause, even where defense counsel's attempt at rehabilitation was denied. *See Littlejohn v. State,* 2004 OK CR 6, ¶ 49, 85 P.3d 287, 301–02.

¶ 21 Appellant's second attack on the *voir dire* process concerns the trial court's failure to remove prospective jurors L.J. and J.L.P. for cause. On the third day of *voir dire,* under questioning by defense counsel, L.J. expressed reservations "about how you shoot five people in self-defense". The trial court immediately adjourned to chambers with the prospective juror and all counsel. During the ensuing discussion, the trial court explained that *voir dire* was not the appropriate time for the attorneys to discuss the intricacies of self-defense. However, the trial court needed to know if the prospective juror was open to listening to the evidence and law as presented during the trial, and setting aside any preconceived notions of

self-defense and determine whether the defendant's action constituted self-defense. L.J. indicated she could, but she wasn't sure if she was "on a level playing field" and that she wanted the defendant to have a fair trial. L.J. said she had some questions and she needed to let the court know. Under questioning by the court, L.J. indicated she could listen to the evidence and follow the instructions given to the jury; that she was uncomfortable based upon her notion of self-defense but she didn't know what the court was going to tell her about self-defense. L.J. agreed with the court that even though she had some concerns, she was open to all the information as it was presented at trial and she would make her decision based on the law as given to the jury by the court.

¶ 22 Under questioning by defense counsel, L.J. said she was very comfortable with the case until the term self-defense was raised and at that point in time, she felt the State was ahead in the "war of persuasion". When L.J. indicated the defense was going to have to work harder than the prosecution, the court stepped in and told L.J. she was getting "mixed feelings" about her ability to be a fair and impartial juror. L.J. admitted she was giving herself "mixed feelings", and she wasn't sure she was the right person to give the defense a fair trial. After informing L.J. the jurors would decide whether or not self-defense applied based on the evidence, L.J. indicated she could be a fair juror. Defense counsel objected on the grounds there was a difference between "I'm not comfortable with it and I can't do it". While admitting she was concerned, L.J. said she could be a fair juror. In asking about L.J.'s specific concerns, the trial court noted that L.J. did not sound concerned about her ability to listen to the evidence or apply the law fairly. L.J. indicated that she felt better having let the court know she was concerned and that she could listen to the evidence and arrive at a proper verdict.

¶ 23 When asked by defense counsel when she would make the defense prove it was self-defense, L.J. replied that she was going to listen to everyone and apply the law as

---

4. L.W. and S.H. were called as alternates. (Tr. Vol. III, pg. 86).

given to the jury by the court. Defense counsel requested L.J. be removed for cause arguing that her answers were unequivocal until she was rehabilitated by the trial court's "skillful rehabilitation." The State disagreed and argued that L.J.'s responses indicated she could be a fair juror. The court denied the request to excuse L.J. for a cause. The defense ultimately used a peremptory challenge to excuse the potential juror from service.

¶ 24 Appellant asserts L.J. should have been excused for cause for exhibiting actual bias under 22 O.S.2001, § 659(2) as she "exhibited a state of mind ... in reference to the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging." Considering the facts of this case, it is not surprising that a potential juror would voice serious concerns over the self-defense claim. L.J. may not have been appreciably different from many others who served on the jury, just a little more vocal about her concerns.

¶ 25 Contrary to Appellant's claim, L.J. was not "incessantly harangued" by the trial court into saying she could be a fair juror. L.J.'s desire to inform the court of her concerns necessitated a more extensive *voir dire* than with certain other jurors. However, we do not find the court improperly persuaded L.J. into saying she could be a fair juror. Given her responses throughout *voir dire*, we are left with the impression that if L.J. felt she could not be a fair juror, she would have said so. Therefore, we are left with judging the credibility of L.J.'s promises to be fair and impartial—and that credibility choice is, of course, one which the trial court is much better suited to make. *See Harris v. State*, 2004 OK CR 1, ¶¶ 16–18, 84 P.3d 731, 742. We find the trial court did not abuse its discretion in refusing to strike L.J. for cause as she did not exhibit any actual bias.

¶ 26 Prospective juror J.L.P. was a Lieutenant in the Oklahoma City Police Department. He was not excused for cause *sua sponte* by the court or challenged for cause by the defense, and was ultimately dismissed by the defense with a peremptory challenge. Appellant claims J.L.P. was statutorily unqualified to serve as a juror pursuant to 38 O.S.2001, § 28(B)(4) and *Fennell v. State*, 1964 OK CR 107, 396 P.2d 889.

¶ 27 In *Fennell*, this Court held that an active duty police officer was not qualified under § 28 to serve as a juror. 1964 OK CR 107, ¶ 14, 396 P.2d at 891. However, the statute in effect at the time excluded from jury service all law enforcement officers or persons having custody or prisoners. *Id.*

¶ 28 Section 28 has since been amended and specifically excludes from jury service "jailers or law enforcement officers, state or federal, having custody of prisoners." *See* 38 O.S.2001, § 28(B)(4). This Court has determined this provision is limited to law enforcement officers or jailers whose principal duty is having custody of or supervising prisoners. *See Rojem v. State*, 2006 OK CR 7, ¶ 28, 130 P.3d 287, 294 (prospective juror whose job was supervising inmates from the Hobart Work Center for the city of Cordell was excluded from jury service under § 28(B)(4)). If, as Appellant claims, the Legislature had intended all law enforcement officers to be disqualified to serve as jurors, they would have specifically said so as was done in subsection (B)(3) specifically excluding sheriffs or deputy sheriffs from jury service. *See* 38 O.S.2001, § 28(B)(3).[5] *See also Warner v. State*, 2001 OK CR 11, 29 P.3d 569, 576 (Lumpkin, P.J., concurring in results).

---

5. Effective November 1, 2008, § 28 was amended to delete from the section the phrase "jailers or law enforcement officers, state or federal, having custody of prisoners." Added as subsection D, the following language was inserted: "Jailers or law enforcement officers, state or federal, shall be eligible to serve on noncriminal actions only." *See* 28 Okla. Sess. Laws 339 (2008). This amendment clearly reflects the Legislature's intention to disqualify law enforcement officers from jury service in criminal matters. However, in the analysis of Appellant's claim of error, we apply the law in existence at the time of the commission of the crime. *See Nestell v. State*, 1998 OK CR 6, ¶ 5, 954 P.2d 143, 144 ("new legislative enactments should only be applied prospectively from their effective date, unless they are specifically declared to have retroactive effect.")

¶ 29 In the present case, J.L.P. was a field supervisor of other police officers. He described himself to defense counsel as a "street cop." He did not reference any experience as a jailor or having custody of prisoners. Therefore, he was not excluded under 38 O.S.2001, § 28(B)(4) from jury service.

¶ 30 While not raised at trial, Appellant now argues on appeal that J.L.P. should have been excused for actual bias under 22 O.S.2001, § 659(2). J.L.P. said that twenty-three years earlier he had worked with one of the prosecutors at the police department, but he had not had any contact with her during the ensuing years; he was acquainted with the police officers in the case on trial and supervised one of the officers on the witness list. He said there was nothing in his relationship with the prosecutor or police officers which would prevent him from being a fair and impartial juror. He said he could keep all of the witnesses on a "level playing field", he could be objective and fairly evaluate the case and could consider all three punishment options.

¶ 31 Under questioning by the prosecutor, J.L.P. said that people he had worked with had told him he was one of the fairest people they had dealt with. He said police officers were witnesses just like any other witnesses and they had to prove their credibility; while he expected a police officer's integrity to be above reproach, that did not mean they were going to be any more honest than any other citizen or witness on the stand; he could listen to all of the evidence and if the State did not meet all of the elements, he would not hesitate to return a verdict of not guilty. In terms of punishment, he said he could listen to the evidence, follow the law and consider all three punishments if so instructed. Under questioning by the defense, J.L.P. said he had never been a homicide detective; he could listen to the evidence and could consider all three possible punishments.

¶ 32 Despite his close ties to the State, J.L.P. was not the sort of biased juror with whom we found error in *Rojem*, 2006 OK CR 7, ¶ 29, 130 P.3d at 294 (prospective juror said "he 'could probably sit fairly,' although he also admitted that 'if I was in [the defendant's] place, I wouldn't want me up here,'" and agreed it would be appropriate for him to be excused). J.L.P. consistently maintained that he could set his knowledge of certain parties aside and render a fair verdict pursuant to the evidence. The trial court did not abuse its discretion in failing to *sua sponte* strike J.L.P. for cause as he did not exhibit any actual bias.

¶ 33 Not surprisingly, Appellant finds defense counsel ineffective for failing to challenge J.L.P. for cause. However, Appellant has failed to prove any resulting prejudice from counsel's performance. *See Rojem*, 2006 OK CR 7, ¶ 36, 130 P.3d at 295 (any claim of jury partiality must focus on the jurors who ultimately sat, because the loss of peremptory challenges is not of constitutional dimension and Appellant must establish prejudice in order to get relief). The defense ultimately removed J.L.P. with a peremptory challenge. After all of the peremptory challenges had been exercised, the defense asked for one more. J.T.W. was named as the juror the defense would have excused, claiming without explanation, that he was biased and very young. (Tr. Vol. III, pg. 80). When that request was denied, defense counsel objected to the empanelling of the jury arguing that a fair jury had not been seated.

¶ 34 On appeal, this Court will not grant relief based on the improper denial of a challenge for cause unless the record affirmatively shows that the erroneous ruling reduced the number of the appellant's peremptory challenges to his prejudice, and he must demonstrate that he was forced, over objection, to keep an unacceptable juror. *Rojem*, 2006 OK CR 7, ¶ 37, 130 P.3d at 295. Appellant has not pointed to a juror whose presence on the jury prevented him from having a fair trial. The record shows Juror J.T.W. was a sophomore in college and was the neighbor of another juror. There was nothing in his *voir dire* which would render him an undesirable juror. Therefore, as Appellant has not shown he was forced to keep an unacceptable juror, he has not shown he was prejudiced by counsel's performance.

¶ 35 Appellant also finds error in the trial court's attempt during death qualifying

*voir dire* to explain the term "consider". The judge compared her consideration of Brussels sprouts despite her dislike for them to the jurors' consideration of all three punishment options. Appellant asserts this analogy confused the jury and warrants a new sentencing hearing. In *Mitchell,* 2006 OK CR 20, ¶ 40, 136 P.3d at 690, fn. 97, this Court cautioned against attempts to define or further explain the term "consider". The Court found "the word 'consider' has a commonly understood meaning; and even good-faith attempts to clarify its significance in this context invariably run the risk of shading its meaning in a way that is misleading or erroneous". *Id.* However, the Brussels sprouts analogy (the same as used in the present case) was not grounds for relief in *Mitchell.* In the present case, in light of the absence of any contemporaneous objection to the analogy, and any indications of juror confusion due to the analogy, we deny Appellant's request for a new sentencing hearing.

¶ 36 Having thoroughly reviewed Appellant's objections to jury selection, we find any errors did not deny him a fair trial. This assignment of error is denied.

### FIRST STAGE TRIAL ISSUES

¶ 37 In proposition one, Appellant claims the trial court committed reversible error by precluding the defense from presenting evidence of the decedents' methamphetamine use in support of his defense of self-defense, thereby violating his right to present a complete defense, in contravention of the Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution and Article 2, Sections 7, 9, and 20 of Oklahoma's Constitution.

¶ 38 Prior to trial, the State filed a motion *in limine* seeking in part to prohibit admission of evidence that officers located illegal drugs and paraphernalia in the Platt residence and testimony that the victims had used illegal drugs the night of the homicides.[6] The State argued that such evidence was not relevant to the charges filed or to support any defense. In pre-trial hearings, the defense responded that the evidence was relevant to explain why Appellant went to the house (he knew it was a "drug house" and wanted to remove his girlfriend from the situation) and to support a claim of self-defense as it explained the victims' abnormally aggressive behavior. The trial court ruled that in the absence of evidence of Appellant's personal knowledge that the victims used drugs that night, any evidence, including the toxicology reports, showing that the deceased victims had used drugs that night or had drugs in their system, was not relevant.

¶ 39 The admission or exclusion of evidence over a timely objection is left to the sound discretion of the trial court whose decision will not be reversed on appeal unless clearly erroneous or manifestly unreasonable. *Hancock v. State,* 2007 OK CR 9, ¶ 72, 155 P.3d 796, 813; *Hogan v. State,* 2006 OK CR 19, ¶ 29, 139 P.3d 907, 920.

¶ 40 Based upon Appellant's testimony that he felt under attack by a crazed mob on drugs and shot only in self-defense, the trial court found the defense of self-defense had been sufficiently raised and so instructed the jury.[7] Evidence that the deceased victims

---

6. The toxicology reports showed Pam Karr's blood contained 2.0 micrograms per milliliter of methamphetamine, 0.18 micrograms per milliliter of amphetamine, and trace elements of diazepam and nordiazepam (Court's Exhibit 1); Joel Platt's blood contained 0.82 micrograms per milliliter of methamphetamine, 0.16 micrograms per milliliter of amphetamine, and trace elements of diazepam and nordiazepam (Court's Exhibit 2); and Brian Galindo's blood contained .25 micrograms per milliliter of methamphetamine and trace elements of diazepam and nordiazepam; Pam Karr's blood contained 2.0 micrograms per milliliter of methamphetamine, 0.18 micrograms per milliliter of amphetamine, and trace elements of diazepam and nordiazepam (Court's Exhibit 3).

7. This writer finds that in responding to the group of unarmed individuals by brandishing weapons, Appellant lost the right of self-defense. *See Ruth v. State,* 1978 OK CR 79, ¶ 7, 581 P.2d 919, 921–922 (if a person by provocative behavior initiates a confrontation, even with no intention of killing the other person, he loses the right of self-defense). Therefore, the trial court should not have instructed the jury on the defense of self-defense. Consequently, the toxicology reports were not relevant evidence and were properly excluded. There was no evidence that Appellant knew the decedents were acting under the influence of illegal drugs, he only guessed that they were. There was no evidence that any methamphetamine found in the decedents' system contributed to any aggressive behavior they

had illegal drugs in their systems would have corroborated Appellant's testimony that the group of people he encountered in the house were under the influence of illegal drugs and acting unusually aggressive, thus causing him to fear for his life and act in defense of his life. *See* 12 O.S.2001, § 2401 (relevant evidence is evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence). In fact, the toxicology reports would have been the only evidence, aside from Appellant's own testimony, supporting his defense.

¶ 41 Evidence regarding the decedents' intoxication levels was also relevant to the manslaughter lesser offense option. The evidence might have convinced jurors that Appellant was acting out of a heat of passion, rather than with malice. The excluded evidence could also have been used to show witness bias and/or as mitigating circumstances for stage two proceedings.

¶ 42 Therefore, we find the trial court abused its discretion in excluding the toxicology reports. However, the error is subject to harmless error review. Having thoroughly reviewed the evidence, we find exclusion of the toxicology reports did not have a substantial influence on the outcome of the trial, *see Simpson v. State*, 1994 OK CR 40, ¶ 37, 876 P.2d 690, 702, nor did it deny Appellant the ability to present a defense. The State's evidence showed that several people at the house had been using marijuana that evening and/or drinking alcohol. Several of the women admitted to using marijuana and officers found some of the drug and drug related paraphernalia on the living room table. If the jury so chose, this evidence could serve to corroborate Appellant's description of those at the house as a "crazy mob", "drugged up," and "tweaked out", and the jury could have found the vic-

tims were the aggressors. However, such a finding was highly unlikely in light of evidence that Appellant arrived at the Platt residence, uninvited, armed with two guns, and repeatedly resisted the homeowner's verbal requests to leave the premises. It is this very evidence which shows that even if the toxicology reports had been admitted, they would not have negated the murder charge or reduced the conviction to first degree manslaughter. Accordingly, this assignment of error is denied.

¶ 43 In proposition two, Appellant claims the trial court committed reversible error under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article II, Sections 7, 9, and 20 of Oklahoma's Constitution by excluding the testimony of defense witness Robert Clark for a discovery violation. Clark was a former detention officer at the Oklahoma County Jail and would have reportedly testified that he saw bruises and scratch marks on Appellant's neck at the time he was arrested, several hours after the homicides. Appellant claims this testimony would have helped corroborate his self-defense claim and its exclusion as a discovery violation by his attorney was an overly harsh remedy under Oklahoma law and the specific facts of this case. He claims, to the extent his trial attorney failed with respect to having Mr. Clark testify, that failure constituted ineffective assistance of counsel.

¶ 44 The record reflects the defense filed its first witness list approximately three months before the August 30, 2004, trial date, and Robert Clark was not listed. Changes in counsel necessitated a continuance and trial was reset for December 2004, February 7, 2005, and February 14, 2005. On February 4, 2005, the defense filed an additional witness list and included Robert Clark's name for the first time, an address in Bethany, Oklahoma, and stated that Clark

may have shown. There was no consensus by the expert witnesses that a particular behavior would be exhibited by a person under the influence of drugs. Therefore, evidence that the decedents may have used methamphetamine before the homicides was not relevant as it did not make it more or less likely that Appellant acted in self-defense in shooting the unarmed victims.

*See* 12 O.S.2001, § 2401. Further, the danger of unfair prejudice substantially outweighed any probative value as the evidence could have led the jury to draw unnecessary and unfavorable conclusions regarding the decedents' character. *See* 12 O.S.Supp.2003, § 2403. However, I recognize the Court's decision to the contrary and accede to that decision.

would testify that he was with Appellant prior to the homicides. The same day the State filed a demand for more specific discovery specifically requesting more information on Robert Clark and his proposed testimony. On February 11, 2005, the defense requested funds to hire Tom Bevel as an expert and the trial was again reset for May 9, 2005. At a status conference held April 4, 2005, defense counsel informed the court he anticipated interviewing a jailer who processed the defendant the day he was arrested, he would provide an updated witness list, and he would provide Tom Bevel's report by that Friday. On April 15, 2005, the defense endorsed Tom Bevel as a witness but did not include a name for the jailer who allegedly processed Appellant into jail.

¶ 45 As their last first stage witness, the defense called Robert Clark informing the court he was the detention officer on duty when Appellant was arrested and would testify that he observed bruises and scratch marks on Appellant's neck. The State objected on the grounds of lack of notice and argued that the discovery it had received listed Clark as testifying he was with Appellant the night of the homicide. Defense counsel responded that when he prepared the initial witness list including Clark's name he did not know what the witness would testify to and that he had just found out the subject of Clark's testimony that day. The trial court noted that the address given for Clark was his home address and that his name had not been included on the list of witnesses read to the jury. The court informed defense counsel she had seen the witness the day before when he was brought to her chambers and introduced as a witness. The trial court determined that someone on the defense team knew the substance of Clark's testimony prior to that day and could have provided the State with the information and given them time to prepare. In the absence of such notice, the court found the discovery violation deliberate and ruled Clark would not testify.

■ ¶ 46 Although the criminal discovery code provides for exclusion of evidence as a sanction for non-compliance, exclusion of a defense witness is a severe sanction, in some cases too severe. *See Rojem*, 2006 OK CR 7, ¶ 49, 130 P.3d at 296–98. The Sixth Amendment Compulsory Process Clause could be violated by excluding a material defense witness as a sanction for a discovery violation. *White v. State*, 1998 OK CR 69, ¶ 12, 973 P.2d 306, 311 citing *Allen v. State*, 1997 OK CR 44, ¶ 11, 944 P.2d 934, 937. "Excluding a material defense witness is appropriate only where the discovery violation is 'willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence.'" *Id.* "Where the discovery violation is not willful, blatant or calculated gamesmanship, alternative sanctions are adequate and appropriate." *Id.*

¶ 47 There clearly was a discovery violation in this case, but excluding Clark's testimony was too severe a sanction. The circumstances surrounding calling Robert Clark as a witness give the impression more of poor preparation by defense counsel than a willful desire to gain a tactical advantage. However, neither the trial court's erroneous exclusion of the witness's testimony nor defense counsel's apparent ineffectiveness in the matter warrants a new trial.

¶ 48 Giving Appellant the benefit of the defense of self-defense, as the trial court did, even without Clark's testimony, Appellant was still able to present to the jury testimony and photographs supporting his claim of injuries suffered at the hands of Joel Platt. Appellant testified to his alleged injuries and how they occurred. Defense forensics expert Tom Bevel identified a photograph wherein he stated he could see a scratch on Appellant's neck.

■ ¶ 49 As for counsel's conduct, we review claims of ineffective assistance under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *Warner v. State*, 2006 OK CR 40, ¶¶ 198–199, 144 P.3d 838, 891–892. *Strickland* sets forth the two-part test which must be applied to determine whether a defendant has been denied effective assistance of counsel. *Id.* First, the defendant must show that counsel's performance was deficient, and second, he must show the deficient performance prejudiced the de-

fense. *Id.* Unless the defendant makes both showings, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Id. quoting Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Appellant must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. *Id.* The burden rests with Appellant to show that there is a reasonable probability that, but for any unprofessional errors by counsel, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.,* citing *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070, 80 L.Ed.2d at 700.

¶ 50 Here, Appellant has failed to prove he suffered any prejudice by counsel's conduct. Clark's testimony would have been subject to impeachment to the extent that Appellant was not arrested immediately after the murders and there was nothing to show that any injuries to his neck did not occur in some other manner in the time between the murders and his arrest. Further, the State presented evidence that any red marks visible on Appellant's neck at the time he was booked into jail were visible in a photograph taken at least one year earlier. In light of this record, Appellant has failed to show there is a reasonable probability that had counsel done more to ensure Clark's testimony the result of the proceeding would have been different. Accordingly, this assignment of error is denied.

¶ 51 In proposition three, Appellant claims reversible error occurred when Officer Hernandez was allowed to testify regarding Carla Phillips' out-of-court statements made at the crime scene. He contends this testimony was improperly admitted hearsay that violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Appellant asserts he was unduly prejudiced by the testimony as Phillips' statements were "radically different" from the trial testimony of all the other eye witnesses, including Phillips herself and was the first rendition of the events surrounding the homicides that the jury heard.

¶ 52 Officer Hernandez testified he and his partner were the third and fourth officers to arrive at the crime scene. After assisting in clearing the house, Officer Hernandez located Ms. Phillips outside of the house and escorted her to his patrol car where he conducted an initial interview with her. The officer's testimony concerning the content of that interview was not met with an objection from the defense. Therefore, we review only for plain error. *Simpson,* 1994 OK CR 40, ¶ 2, 876 P.2d at 693.

¶ 53 On appeal, the State submits this evidence was properly admitted under the "excited utterance" exception to the hearsay rule. 12 O.S.2001, § 2803(2). However, in *Marquez v. State,* 1995 OK CR 17, ¶ 17, 890 P.2d 980, 984–985 we held that statements made during the course of the police interview process after the investigation of a crime has begun lack spontaneity and do not qualify as excited utterances. Ms. Phillips' statements were given as the result of police questioning and therefore do not qualify as an excited utterance. As Ms. Phillips' out of court statements were offered for the truth of the matter asserted and with no applicable hearsay exception, it was error to admit the testimony. However, neither this error nor counsel's failure to raise an objection warrants reversal of the convictions and a new trial.

¶ 54 Contrary to Appellant's claims, Ms. Phillips' out-of-court statements to Officer Hernandez were not "radically different" from her trial testimony. Although the statements and trial testimony differed on certain points, both Hernandez and Phillips were subject to cross-examination. The jury also heard testimony from other witnesses which in some respects contradicted Ms. Phillips' recitation of events to Officer Hernandez. Considering Ms. Phillips' out-of-court statements in light of the other evidence presented at trial, we find its erroneous admission did not have a substantial influence on the outcome. *See Simpson,* 1994 OK CR 40, ¶ 37, 876 P.2d at 702. Counsel's failure to object to the evidence does not constitute ineffective assistance of counsel as

Appellant has failed to show a reasonable probability that had counsel raised an objection, the result of the trial would have been different. This assignment of error is denied.

■ ¶ 55 In his seventh proposition of error, Appellant claims certain photographs (five showing Pamela Karr laying dead at the scene or at the morgue, four showing Joel Platt laying dead at the scene or at the morgue, five morgue photos of Brian Galindo, three hospital photos of Tara Platt, and other crime scene photos) were cumulative to other photos that fairly depicted the crime scene. He also claims blood-stained clothing from the victims admitted as evidence was irrelevant and highly prejudicial and deprived him of a fair trial in violation of the Eighth and Fourteenth Amendments of the U.S. Constitution and Article II, Sections 7 and 9 of Oklahoma's constitution.

■ ¶ 56 The admissibility of photographs is a matter within the trial court's discretion and absent an abuse of that discretion; this Court will not reverse the trial court's ruling. *Warner*, 2006 OK CR 40, ¶ 167, 144 P.3d at 887. Photographs are admissible if their content is relevant and their probative value is not substantially outweighed by their prejudicial effect. *Id.* The probative value of photographs of murder victims can be manifested in numerous ways, including showing the nature, extent and location of wounds, establishing the *corpus delicti*, depicting the crime scene, and corroborating the medical examiner's testimony. *Id.*

¶ 57 The challenged photographs were relevant to aid the jury in understanding testimony from police officers and the medical examiner concerning the position of the bodies when shot, and the nature and extent of the gunshot wounds. The photographs were relevant in establishing the *corpus delicti* and to disprove the defense of self-defense. Although some blood is seen in certain photographs, it is minimal. Therefore, we reject Appellant's suggestion the photos were introduced solely to inflame the jury. As we have said previously, gruesome crimes make for gruesome photos and the State was not required to downplay the violence involved or its repercussions. *See Id.* While certain images in the photographs are cumulative to other photographs, Appellant has failed to meet his burden of showing the repetition was needless or inflammatory. *Id.*

■ ¶ 58 As for the bloody clothing, two shirts and a pair of jeans worn by Galindo (State's Exhibits 226, 227 and 228) were identified and introduced at trial. Testimony showed that the bullet holes in the shirts were consistent with Galindo's wounds. The shirt and jeans worn by Joel Platt (State's Exhibits 222 and 223) were identified as clean on the front except for blood on the upper right shoulder. These exhibits corroborated the State's argument that Platt was shot while running away from Appellant and not toward him. Although the clothing corroborated certain testimony from the State, it was not so cumulative as to be unduly prejudicial.

¶ 59 Both the photographs and clothing were probative and that probative value was not outweighed by any prejudicial impact. Appellant has failed to meet his burden of prejudice, and we find the trial court did not abuse its discretion in admitting the evidence.

■ ¶ 60 In proposition eight, Appellant claims the 911 calls were erroneously admitted because they were more prejudicial than probative. Tara Platt sponsored an audio tape recording of the two 911 calls she and Tara Johns made from the crime scene on the night of the homicide. The recordings were admitted over defense objections. (State's Exhibit 298). The first call was made by Tara Johns. She was shot several times after she made the call and was not able to converse with the dispatcher. However, background sounds can be heard such as gunshots, and screams including screams by Appellant for Ms. Phillips, for someone to help him and that "they were trying to kill" him. In the other 911 call, Tara Platt identified Appellant as the shooter and said that several people had been shot.

¶ 61 Despite defense counsel's initial objection to the tapes, the record reflects Appellant actually relied on the tapes to support his defense of self-defense. Therefore, his

appellate claim of error is not well taken. Further, the tapes materially assisted the State in disproving the defense of self-defense as the jury could hear for itself the repercussions of Appellant's conduct. The tapes corroborated the testimony of many of the State's witnesses. As such, the cumulative nature of the evidence was not so prejudicial as to warrant its exclusion. The State is not prohibited from presenting the jury with visual evidence from the crime scene merely because a witness has already verbally described the evidence. As with photographs, only where the evidence tends to elicit an emotional rather than rational judgment by the jury should the evidence be excluded. *Warner*, 2006 OK CR 40, ¶ 170, 144 P.3d at 887. Here, the probative value of the 911 calls was not substantially outweighed by the danger of unfair prejudice; therefore the trial court did not abuse its discretion in admitting the 911 recordings.

### *FIRST STAGE JURY INSTRUCTIONS*

¶ 62 In proposition four Appellant argues that the trial court's instructions to the jury regarding trespasser and aggressor were improper as they were not supported by the evidence. Appellant also finds counsel ineffective for failing to object to the instructions.

¶ 63 Having made the decision to give the jury instructions on the defense of self defense, it was the trial court's duty to fully instruct the jury on the applicable law. *See Hogan*, 2006 OK CR 19, ¶ 39, 139 P.3d at 923. The determination of which instructions are warranted by the evidence remains a matter of trial court discretion. *Id.* Jury instructions are sufficient if when read as a whole they state the applicable law. *Id.* We will reverse the judgment only where an error in the instructions to the jury has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right. *Id.*

¶ 64 The instructions on aggressor and trespasser were appropriately given in this case as they fully explained the defense of self-defense and were supported by the evidence. The jury was given the uniform instructions on self-defense. These instructions informed the jury in part that self-defense is not available to a person who was the aggressor or provoked another with the intent to cause the altercation or who voluntarily entered into mutual combat; a person who was not the aggressor and did not provoke another with intent to cause an altercation or did not voluntarily enter into mutual combat has no duty to retreat, but may stand firm and use the right of self-defense; and a person is an aggressor when that person by his wrongful acts provokes, brings about, or continues an altercation (the use of words alone cannot make a person an aggressor). (OUJI–CR (2d) 8–50–8–53).

¶ 65 When the evidence is disputed as to who was the aggressor, the determination should be made by the jury under appropriate instructions. *See Keith v. State*, 1985 OK CR 150, ¶ 17, 709 P.2d 1066, 1070. Although the evidence in this case was conflicting, sufficient evidence was presented to support the instructions. Appellant arrived at the Platt home armed with two loaded pistols. At no time was anyone else in the house armed. Although Appellant had been shoved, possibly pushed, and shouted at to leave, he had not been kicked, hit, punched or threatened with any bodily injury. Yet, he refused repeated requests to leave and instead pulled out two guns and shot five people. This evidence was sufficient evidence to support giving the "aggressor" instructions.

¶ 66 As for the trespasser instructions, the uniform instructions given to the jury essentially explained that the defense of self-defense is available to a person who was a trespasser only if the trespasser availed or attempted to avail himself of a reasonable means of retreat from the imminent danger of death or great bodily harm before repelling an unlawful attack and that a person is a trespasser if that person has refused to leave the land of another after a lawful request to leave has been made to him. (OUJI–CR (2d) 8–54–855).

¶ 67 Relying on his own testimony, Appellant argues the instruction was not warranted because before he was told to leave, he was assaulted first by Tara Platt and then by

Joel Platt and Brian Galindo. As with many issues in this case, the evidence was conflicting. However, the State's evidence showed that Appellant was initially allowed into the home by the homeowner, but she later told him to leave. Contrary to Appellant's argument, whether she initially asked him to leave before she shoved him or afterward is not a determining factor. Ms. Platt asked Appellant several times to leave. Each time he refused, often on the basis that he needed to talk with Ms. Phillips. He was also told by others at the house to leave. Instead of retreating or leaving the house, Appellant pulled out two guns and shot five people. When Appellant refused to leave after being asked to, he was clearly a trespasser. *See Walston v. State*, 1979 OK CR 69, ¶ 6, 597 P.2d 768, 770–771. Tara Platt's shoving of Appellant (causing him to fall over the child's chair) was not a dangerous or unlawful attack which would require Appellant to fire two .45 pistols into five people who were standing no more than 3 to 4 feet away from him. Joel Platt's leading Appellant to the door in an effort to get him out of the house, after several requests had been made for Appellant to leave, was a reasonable use of force under the circumstances. Appellant further argues that "cluttering up self-defense instructions" with the erroneous instructions imposing on him a duty to retreat which did not exist under the evidence took away his defense. The instructions on aggressor and trespasser did not hamper Appellant's defense. Appellant was still able to fully present his side of the story and the aggressor and trespasser instructions did not prevent the jury from fully considering his defense. Based upon the evidence, the trial court did not abuse its discretion in giving instructions on aggressor and trespasser.

¶ 68 As for Appellant's claim of ineffective assistance of counsel, the record reflects defense counsel did not object to the trespasser instructions and that he requested the instructions on aggressors. Reviewing counsel's conduct under the standard set forth in *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, we find Appellant has failed to show any prejudice resulting from counsel's performance. *See Warner*, 2006 OK CR 40, ¶ 198, 144 P.3d at 891. In light of the trial court's decision to give instructions on self-defense, the instructions on trespassers and aggressors were appropriately given based on the law and evidence in this case. We will not find counsel ineffective for failing to raise objections which would have been denied. *See Phillips v. State*, 1999 OK CR 38, ¶ 104, 989 P.2d 1017, 1044. Accordingly, this assignment of error is denied.

## SECOND STAGE ISSUES

¶ 69 In proposition six, Appellant claims the prosecutor's closing argument in second stage was improper and amounted to prosecutorial misconduct that "crossed the bounds of permissible argument" by telling jurors they would be violating their oaths if they sentenced Appellant to anything but death. Defense counsel's contemporaneous objections properly preserved the issue for appellate review.

¶ 70 "[A] ... a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Ryder v. State*, 2004 OK CR 2, ¶ 82, 83 P.3d 856, 875, quoting *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1, 11 (1985). In order for the remarks of the prosecuting attorney to constitute reversible error they must be flagrant and of such a nature as to be prejudicial to the defendant. *Id.* From a practical standpoint, every slight excess by the prosecutor does not require that a verdict be overturned and that a new trial be ordered. *Id.*

¶ 71 In the second part of her closing argument, the prosecutor responded to defense counsel's argument that death was not the only answer. The prosecutor reminded the jurors they had taken an oath to follow the law and that since the evidence had been presented, they needed to follow that oath and render a verdict according to the law and the evidence, and this included considering the entire instruction packet. The prosecutor noted that a juror could have said in jury selection that he or she would vote for the

death penalty and then after the start of trial decide they could not do that. However, the jurors were on the case based upon their representations that they would follow the law and base their verdict on the evidence and law as given by the trial court. The prosecutor did not tell the jury they would be violating their oath if they considered the mitigating evidence. In fact, later in her argument, the prosecutor specifically addressed particular mitigating factors, telling the jury to look at all the mitigating evidence when weighing it against the evidence in aggravation. The comments focused on the jurors' duty and it did not convey the message that they had to vote for the death penalty or to decide the case based on emotional reaction. *See Moore v. State,* 1987 OK CR 68, ¶ 33, 736 P.2d 161, 167.

¶ 72 Appellant also claims the prosecutor's argument led the jurors to believe they must reach a unanimous agreement in the second stage proceedings. Appellant compares the argument to that condemned in *Hooks v. State,* 2001 OK CR 1, ¶¶ 48–49 408, 19 P.3d 294, 316. In *Hooks,* the prosecutors argued in part against the prospect of a hung jury, anticipated defense counsel's reminder that it took only one juror to avoid the death sentence, read the dictionary definition for jury nullification and told jurors this would impede or attempt to prevent enforcement of the law. The prosecutors argued "one or two people could cripple the system, cut it up and eviscerate it." This Court "strongly caution[ed] prosecutors against using this argument during the second stage of a capital trial." *Id.*

¶ 73 The comments in the present case are not as egregious as those in *Hooks.* Here, the prosecutor did not misstate the law, but merely reiterated the jury's promise to follow their oath and the law. When read in context of the entire closing argument and the instructions given to the jury, the challenged comments did not deny Appellant a fair sentencing proceeding. This assignment of error is denied.

¶ 74 In proposition nine, Appellant claims the definition of mitigating circumstances in Oklahoma jury instruction OUJI–CR 2d, 4–78, combined with the prosecutor's closing argument addressing the instruction, impermissibly limited consideration of mitigating evidence and violated his right to a reliable sentencing proceeding, as guaranteed by the Eighth and Fourteenth Amendments to the U.S. Constitution and Article II, Section 9 of Oklahoma's Constitution.

¶ 75 We have previously rejected challenges to OUJI–CR 2d, 4–78 finding the instruction does not unconstitutionally limit the jury's consideration of evidence that may support a sentence less than death. *Malone v. State,* 2007 OK CR 34, ¶ 87, 168 P.3d 185, 219; *Harris v. State,* 2007 OK CR 28, ¶¶ 24–25, 164 P.3d 1103, 1113; *Primeaux v. State,* 2004 OK CR 16, ¶ 92, 88 P.3d 893, 909–10; *Williams v. State,* 2001 OK CR 9, ¶¶ 108–109, 22 P.3d 702, 727.

¶ 76 As for the prosecutor's arguments, we review only for plain error as those comments now challenged on appeal were not met with objections at trial. In *Harris,* which was handed down after the briefing in this case, we noted that the problem was not so much the instruction, but the way it was being misused by prosecutors. There, as in the instant case, one prosecutor consistently argued in closing that jurors should not consider second stage evidence as mitigating, since it did not extenuate or reduce his guilt or moral culpability. This argument, just like the one in *Harris,* improperly told jurors not to consider mitigating evidence. However, as in *Harris,* the prosecutor's improper argument on this issue was cured by further argument and instruction. Considering the entire context of the closing argument, and the written instructions, there was no reasonable likelihood that the prosecutor's arguments led the jury to believe it could not consider Appellant's mitigating evidence in determining his sentence. Accordingly, this assignment of error is denied.

¶ 77 In proposition ten, Appellant claims the evidence supporting the heinous, atrocious, or cruel aggravating circumstance relating to the deaths of Brian Galindo and Joel Platt was insufficient. Appellant asserts that the shootings rendered each of these two victims unconscious nearly instantaneously and that Brian Galindo could have suf-

fered nothing more than momentary pain, possibly no more than a minute's worth.

¶ 78 When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, this Court reviews the evidence in the light most favorable to the State to determine if any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. *Warner*, 2006 OK CR 40, ¶ 122, 144 P.3d at 878. To prove the "especially heinous, atrocious or cruel" aggravator, the State must show that the murder of the victim was preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty. *Id.* 2006 OK CR 40, ¶ 129, 144 P.3d at 880.[8] After making the above determination, the attitude of the killer and the pitiless nature of the crime can also be considered. *Lott v. State*, 2004 OK CR 27, ¶ 171, 98 P.3d 318, 358.

¶ 79 The evidence shows Galindo received five gunshot wounds, none of which would have caused instantaneous death. Testimony showed that when confronted by the gun wielding Appellant, Galindo put his hands up, asked Appellant to put the gun away and solve the problem another way. The evidence as to Galindo's length of consciousness and actual physical suffering was contradictory. However, testimony from the medical examiner showed that Galindo could have remained conscious after he was shot for approximately five minutes and would have been in pain during that time. Testimony also showed that the trajectory on the wound to Galindo's shoulder indicated he was standing when he received that injury. Other wounds had a trajectory indicating he was bending at the waist at the time he was shot. The medical examiner testified the wound to the shoulder was not fatal and was survivable. Further, after Galindo had been shot and fallen to the ground, Pam Karr came to his aid before she was shot in the head. From this evidence, the jury could easily infer Galindo saw his girlfriend shot before he lost consciousness. While the existence of this aggravator was a close call, reviewing the evidence in the light most favorable to the State, the evidence supports a finding that Galindo's death was preceded by physical suffering and mental cruelty.

¶ 80 As for the murder of Joel Platt, Appellant threatened the unarmed Platt with a gun pointed at his head in a home where his sister and her children were present. With his friends held at gunpoint in the bedroom, Platt was forced to locate Appellant's girlfriend in the house. Upon returning with her, he personally witnessed three of his friends, including his own sister, shot by Appellant. He turned from that scene only to see Tara Johns being shot by Appellant in the living room. In an attempt to leave that scene, he was shot in the back of the head. The location where his body was found suggests he was not attempting to leave the house but was headed towards a back bedroom, possibly where his young nephew was sleeping. While the physical suffering found in most homicides deemed heinous, atrocious or cruel is not evident in Platt's murder, the anticipation of death caused by the knowledge that others around the victim are being shot is sufficient to support the mental anguish requirement of the aggravator. *See Hancock v. State*, 2007 OK CR 9, ¶ 121, 155 P.3d 796, 824 (evidence sufficient to support aggravator where unarmed victim witnessed shooting of friend and was fatally shot while attempting to help his friend); *Hamilton v. State*, 1997 OK CR 14, ¶ 56, 937 P.2d 1001, 1014 (evidence of aggravator held sufficient where four employees were made to kneel while each one was systematically shot in the head and died).

¶ 81 Appellant further asserts that without the improper finding of the heinous, atrocious or cruel aggravator, the jury likely would not have imposed a death sentence for any of the homicide victims, as the "great risk of death" aggravating circumstance alone could not outweigh the evidence in mitigation. Although we have found sufficient evidence to support the heinous, atrocious or cruel aggravator, we find the evidence was also sufficient to support the "great risk of death" aggravator.

---

8. 21 O.S.2001, § 701.12(4).

¶ 82 The aggravating circumstance of creating a great risk of death is proved by a defendant's acts which create a risk of death to another in close proximity, in terms of time, location, and intent to the killing. *Eizember,* 2007 OK CR 29, ¶ 123, 164 P.3d at 239. The rationale behind the aggravator is that, by its very language, there must be a risk of death, that risk must be to more than one person, it must be great, and the defendant must know that risk exists. *Id.* It is not merely the death of more than one person that satisfies this aggravator, but the acts of a defendant that create a great risk of death to at least one other person who is near to the homicide. *Id.* 2007 OK CR 29, ¶ 125, 164 P.3d at 239. In fact the death of a person other than the homicide victim is not a prerequisite for a finding of this aggravator. *Id.* The gravamen of the circumstance is not the number of persons killed, but the callous creation of the risk to more than one person. *Id.* In the present case, Appellant emptied two semi-automatic weapons in a house full of adults and children, fatally wounding three. Victims killed in the same manner, at the same place, and at essentially the same time, presents "a classic example of the 'great risk of death' aggravating circumstance." *Dodd v. State,* 2004 OK CR 31, ¶¶ 106–107, 100 P.3d 1017, 1047–48.

¶ 83 Therefore, we find the evidence sufficient to support both aggravating circumstances. The weighing of these aggravators against the mitigating evidence we address below under the mandatory sentence review.

¶ 84 In proposition eleven, Appellant claims the opinion of one victim impact witness, Brian Galindo's mother, was constitutionally untenable when she testified she felt "[Appellant] needs to pay for death with his life." This Court has previously upheld admission of the opinion of a victim impact witness as to the appropriateness of the death penalty as long as it is limited to the simple statement of the recommended sentence without amplification. *Young v. State,* 2000 OK CR 17, ¶ 83, 12 P.3d 20, 43. *See also DeRosa v. State,* 2004 OK CR 19, ¶ 81, 89 P.3d 1124, 1151–52; *Murphy v. State,* 2002 OK CR 24, ¶¶ 44–45, 47 P.3d 876, 885.

Appellant has not presented a new argument or new authority in support his assertion we should reconsider our decision. As such, we decline to revisit the issue and find that as the testimony in this case fit within the above parameters, it was properly admitted. This assignment of error is denied.

## CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 85 In proposition twelve, Appellant claims his trial counsel was ineffective for failing to (1) seek admission of Appellant's alleged bipolar disorder; and (2) make a better offer of proof regarding the possible effects of methamphetamine use on the victims' behavior. These arguments are further developed in the *Application for Evidentiary Hearing on Sixth Amendment* Claims filed simultaneously with the direct appeal. Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2008) allows an appellant to request an evidentiary hearing when it is alleged on appeal that trial counsel was ineffective for failing to "utilize available evidence which could have been made available during the course of trial. . . ." *Id.* Once an application has been properly submitted along with supporting affidavits, this Court reviews the application to see if it contains "sufficient evidence to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i). In order to meet the "clear and convincing" standard set forth above, Appellant must present this Court with evidence, not speculation, second guesses or innuendo. *Lott,* 2004 OK CR 27, ¶ 136, 98 P.3d at 351.

¶ 86 The defense presented no evidence in either stage of trial that Appellant suffered from a mental illness or mental disorder. Wanda Draper, Ph.D., testified during the second stage to Appellant's chaotic family background and its negative effect on his emotional stability and his ability to control his aggressive tendencies. However, she was not a psychologist and could not and did not give any diagnosis of a mental illness or

personality disorder. Included in the application for evidentiary hearing are affidavits which Appellant asserts show the availability of evidence before trial indicating he suffered from bipolar disorder.

¶ 87 In Exhibit A, Dr. Ray Hand, Ph.D., testified that in January 2005 (approximately 4 months before trial) he met with Appellant at the Oklahoma County Jail and administered some psychological tests. Dr. Hand did not diagnose Appellant as having bi-polar disorder, noting that the interpretive report for the MCMI–III did not show that Appellant suffered from bipolar disorder. He found Appellant was subject to manic episodes of an "explosive and hostile character." Dr. Hand also noted signs of feigning by Appellant or exaggerating his symptoms, i.e., a "high debasement score." Dr. Hand indicated more work needed to be done before he could confirm or rule out a diagnosis. Dr. Hand stated that he had shared his findings with defense counsel who told him not to assess or evaluate Appellant further. Dr. Hand stated that defense counsel told him he felt that in the context of this case, the evaluation could be a potential liability and more of a risk than a help to the defense.

¶ 88 Exhibit B is a sworn affidavit from Jack Randall Price, Ph.D., who states that he was retained by appellate counsel to conduct a psychological and neuropsychological evaluation of Appellant. Dr. Price diagnosed Appellant as suffering from a long-standing bipolar disorder. In arriving at this diagnosis, Dr. Price addressed Appellant's history of significant alcohol and drug abuse; his discharge from the military for illegal drug use; and his status as a former seller of drugs. Dr. Price found Appellant's attempts to self-medicate with drugs and alcohol only served to exacerbate his mood swings, and "[t]he use of drugs and alcohol acted to disinhibit his agitated mood state, leading to unpredictable and aggressive behavior."

¶ 89 Also included are affidavits from Appellant's half-brother, Jason Jones, and cousin, Mike Ballard. (Exhibits C & D). Both men state they grew up with Appellant and were with him during the afternoon and evening of April 11, 2003, before Appellant went to the Platt residence. Their affidavits provided information about Appellant's family, his personality, his explosive temper, as well as his drug and alcohol use in the hours before the shootings. Both men state they talked with defense counsel but for various reasons were not called to testify at trial. Affidavits from Appellant's mother, Tedi J. Roberts, and his uncle, Matthew Scott Ballard (Exhibits E & F) provide further anecdotal evidence of Appellant's explosive behavior.

¶ 90 In a pre-trial motion hearing, defense counsel informed the court that Appellant had a history of bipolar disorder and the information might be useful to the self-defense claim. Counsel indicated he was going to rely on testimony from a jail psychiatrist (unnamed at that time) who had prescribed medication for Appellant which would not have been prescribed if Appellant did not have a mental illness. The court informed defense counsel that if an expert was called for the defense, the State would be entitled to have its own expert examine Appellant. Defense counsel was informed that if in fact the jail psychiatrist or any expert had diagnosed Appellant with a mental illness, a report needed to be prepared and turned over to State. Defense counsel informed the court he had no intention of calling Dr. Hand as a witness.

¶ 91 The failure to present any evidence that Appellant suffered from bipolar disorder has all the hallmarks of a strategic decision. Dr. Hand, Jason Jones, and Mike Ballard all indicated in their affidavits they spoke with defense counsel prior to trial and none of them were called to testify. Tedi Roberts and Michael Ballard testified in the second stage, but were not asked about Appellant's mental state. Defense counsel was informed that if the defense called an expert, the State was entitled to do the same. The failure to present the evidence was deliberate trial strategy and not merely an oversight by defense counsel.

¶ 92 Counsel's decision not to present evidence of any bipolar disorder was reasonable under the circumstances as the State's cross-examination of the witnesses would have brought out much damaging information regarding Appellant's drug use and violent

temper. This is clearly illustrated by Dr. Price's affidavit which shows that any evidence of Appellant's bipolar disorder would have been accompanied by evidence that Appellant had a history of significant alcohol and drug abuse and the use of the drugs and alcohol lead to unpredictable and aggressive behavior on Appellant's part. Further, Dr. Hand's affidavit reveals he advised counsel there was no bipolar illness, only evidence of Appellant feigning the symptoms. Evidence that Appellant may have suffered from bipolar disorder contains the " 'double edge' the Supreme Court has found sufficient to justify limited investigations." *Lott*, 2004 OK CR 27, ¶ 161, 98 P.3d at 356 *quoting Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). The defense theory that Appellant was defending himself against a crazy, "drugged out" mob, would have had much less impact in the face of information that he had schizophrenic or bipolar tendencies.

¶ 93 The decision to instead use Dr. Draper to explain Appellant's family background and its effect on him presented the more viable option for counsel at the time. Dr. Draper testified that growing up, Appellant, his parents and younger sister lived in a camper, a tent and then a small house built by his father. Dr. Draper said Appellant's mother was preoccupied with making a living, stressed and depressed over the family living conditions and eventually emotionally withdrew from the family. She testified that throughout Appellant's life, his mother was not strong enough to give him the kind of help he needed. Dr. Draper said Appellant's parents had numerous verbal and physical alterations and by the time Appellant was 8 years old had divorced. Appellant and his younger sister lived with his mother and Appellant became very protective of his sister.

¶ 94 By the time the children were in middle school, they were separated with Appellant living with his father and his sister living with his mother. Appellant's father abused alcohol and drugs. Appellant was emotionally upset by the separation from his sister. He began to get into trouble. Appellant had been grounded by his father on the date his sister accidentally died from a fall. He felt responsible as he had not been with her and watching out for her at the time. After his sister's death, his father drank even more while his mother became even more emotionally detached. Appellant continued to get into trouble both in school and outside of school. He moved with his mother to Florida briefly but returned to Oklahoma City for high school. He began to hang out with "the wrong crowd", his older brother introduced him to marijuana, he dropped out of school, had his driver's license suspended, and by the time he was eighteen had fathered a child.

¶ 95 Dr. Draper testified that Appellant had a "rescue mentality toward girls in his life" and a "protective mentality" which stemmed from his sister's untimely death. Dr. Draper said when Appellant met Carla Phillips, he believed her greatest problem was with drugs and he tried to protect her from her friends who used "hard drugs." She testified that because Appellant did not have at least one emotionally stable parent in his life, he began to make poor decisions. She said he did not have the basis for sympathy for himself or for others that would help to mitigate against aggression and behaviors that were not appropriate.

¶ 96 Dr. Draper also testified to anecdotal evidence of Appellant's good character. She testified that he once sat with sick puppies, nursing them for several days until they regained their health; he had previously stopped at the scene of a car wreck and helped pull a woman out of a damaged car; and he had wrestled a gun away from his brother who had pointed it at his uncle.

¶ 97 The affidavits from Dr. Hand and Dr. Price and the testimony of Dr. Draper all contain information unflattering to Appellant. However, Dr. Draper's testimony contained more evidence likely to be considered mitigating than did the affidavits of Dr. Hand and Dr. Price. This record shows "a reasoned strategic decision, made after a reasonably thorough investigation, not to present [evidence of bipolar disorder] because it would have opened the floodgates to evidence very harmful to Appellant." *Id.*, 2004 OK CR 27, ¶ 162, 98 P.3d at 356. Even with the

evidence that Appellant might have suffered from a bipolar disorder, the State's evidence in aggravation was great in this case, while the mitigating evidence was much weaker. Presentation of the evidence would not have significantly influenced the jury's appraisal of Appellant's moral culpability. *Id.,* 2004 OK CR 27, ¶ 162, 98 P.3d at 356.

¶ 98 In light of this record, we find Appellant has failed to show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to investigate further and utilize the complained-of evidence. Therefore, an evidentiary hearing is not warranted.

 ¶ 99 As for Appellant's claim that an evidentiary hearing is warranted because counsel failed to make a sufficient offer of proof regarding the possible effects of methamphetamine use on the victims' behavior, three affidavits are offered. In Exhibit G, appellate investigator Jolene Perham stated she interviewed chief medical examiner Dr. Jeffrey Gofton who performed the autopsy on Brian Galindo. She states that Dr. Gofton informed her he did not think the .25 micrograms per milliliter of methamphetamine found in Galindo's system to be particularly high considering his size and weight. Ms. Perham also stated she interviewed Dr. Phillip Kemp, Chief Forensic Toxicologist, who determined that the amount of methamphetamine found in Galindo's system was considered to be a high level and the amount of methamphetamine found in Joel Platt's system and Pamela Karr's system was considered high. Ms. Perham stated that Dr. Kemp did not provide her with specific details regarding how the methamphetamine could have affected the behavior of the victims, except to say that each individual may react differently to the drug and it is not possible to predict exactly how an individual will behave.

¶ 100 Exhibits H and H2 are affidavits from David R. Wallace, Ph.D., who was contacted by appellate counsel to evaluate the levels of various substances found in the system of the homicide victims and determine the possible effects of the substances on their behavior at the time of the offenses. Dr. Wallace stated that if asked to do so he would testify in part that methamphetamine use can lead to aggressive behavior and psychological disorders such as depression, hallucinations, paranoia. He also stated that use of diazepam could lead to increased aggression. He opined that the use of methamphetamine, diazepam, and alcohol by the victims "very well could have been a precipitating factor in a potentially aggressive and over-exaggerated response to a perceived hostile threat."

¶ 101 The record reflects the trial court took the position that it was first necessary for Appellant to show that he was aware of the victims' methamphetamine use and that his decision to use deadly force in self-defense was influenced thereby. Appellant could not make such a showing as he had not previously met Brian Galindo or Pam Karr. Therefore, the trial court found evidence of the victim's methamphetamine was not relevant evidence. Having reviewed the record, no amount of evidence submitted in an offer of proof about the effects of methamphetamine use would have altered the trial court's ruling.

¶ 102 Accordingly, having thoroughly reviewed Appellant's *Application* and accompanying affidavits, we find he has failed to show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to investigate further and utilize the complained-of evidence. We decline to grant Appellant's application for an evidentiary hearing on Sixth Amendment grounds.

¶ 103 Further, we have reviewed the claims of ineffective assistance raised in the appellate brief under the standard set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *See Warner,* 2006 OK CR 40, ¶ 199, 144 P.3d at 892. Based upon the above discussion, we find Appellant has not shown that in failing to present evidence of Appellant's alleged bi-polar disorder and methamphetamine use by the decedents that counsel's performance was deficient or that he was prejudiced by counsel's conduct. Therefore, the claim of ineffective assistance of counsel is denied.

### ACCUMULATION OF ERROR CLAIM

¶ 104 In his thirteenth assignment of error, Appellant contends that, even if no individual error merits reversal, the cumulative effect of such errors warrants either reversal of his conviction or a modification of his sentence. A cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Warner*, 2006 OK CR 40, ¶ 223, 144 P.3d at 896. However, when there have been numerous irregularities during the course of a trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors is to deny the defendant a fair trial. *Id.* While certain errors did occur in this case, even considered together, they were not so egregious or numerous as to have denied Appellant a fair trial. Therefore, no new trial or modification of sentence is warranted and this assignment of error is denied.

### MANDATORY SENTENCE REVIEW

¶ 105 Pursuant to 21 O.S.2001, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.2001, § 701.12. Turning to the second portion of this mandate, the jury found the existence of the "great risk of death" aggravator in each of counts I, II and III and the existence of the additional aggravating circumstance "heinous, atrocious or cruel" in Counts II and III (the murder of Brian Galindo and Joel Platt, respectively). *See* 21 O.S.2001, § 701.12(2),(4). As discussed in Proposition Ten, the aggravators were supported by sufficient evidence.

¶ 106 Appellant presented four witnesses in mitigation, his mother, father, uncle, and Dr. Wanda Draper. These witnesses testified generally that at the time of the murders, Appellant was overcome by strong emotions; he was twenty-three years old at the time of the murders; Appellant never had anyone help him overcome his feelings of survivor's guilt and helplessness over his sister Tia's death; he is extremely remorseful for what he did and even asked his friend Andy Yarber to kill him after the shootings; Appellant turned himself in and cooperated fully with the police; he experienced a troubled family life with both parents abandoning him emotionally and many times physically, when he needed their guidance, support and help to deal with the break up of the family and then his sister's untimely death; and Appellant was denied parental guidance setting appropriate limits and experiences to build a positive self image and emotional stability. This evidence was summarized and presented to the jury in Instruction No. 10 along with any other mitigating evidence the jury might find existed.

¶ 107 Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate in each of Counts I, II and III. Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.2001, § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence. Accordingly, we find no error warranting reversal or modification.

### DECISION

¶ 108 The **JUDGMENTS** and **SENTENCES** for First Degree Murder are **AFFIRMED,** as are the **JUDGMENTS** and **SENTENCES** for Shooting with Intent to Kill, and the **APPLICATION FOR EVIDENTIARY HEARING ON SIXTH AMENDMENT CLAIMS IS DENIED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2007), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

A. JOHNSON, V.P.J. and LEWIS, J.: concur.

C. JOHNSON, P.J.: concur in result.

CHAPEL, J.: dissent.

CHAPEL, J., Dissenting.

¶1 The majority finds three separate errors in the presentation of first-stage evidence in this case. The majority finds the trial court erred in prohibiting Jones from presenting evidence which was relevant and would have assisted jurors, and in allowing hearsay evidence. However, the majority concludes that these serious errors were harmless. In doing so, the majority speculates that the evidence would have had no effect on the jury's verdict. I cannot agree with that conclusion. I also believe that jurors L.J. and J.L.P. should have been excused for cause. I dissent.

¶2 I begin by discussing Jones's voir dire claims in Proposition V. I believe that in the recent past the Court has unnecessarily complicated our discussion of claims involving jurors who should have been excused for cause. In this writing, I explain that belief. I encourage the Court to give guidance to trial courts and counsel by returning to the simple application of our standard of review, in which the Court is not forced to second-guess or substitute our own judgment for that of defense counsel.

¶3 I disagree with the majority's resolution to and analysis of Proposition V. I note at the outset that the majority's entire legal discussion of Jones's claims regarding challenges for cause is structurally flawed, and thus incoherent. Jones claims that the trial court erred in rejecting his challenge to L.J., and that trial counsel was ineffective for failing to challenge J.L.P. An appropriate appellate analysis would first review the merits of the claim regarding L.J., including a discussion of whether Jones preserved that issue for review. Then the analysis would move to the ineffective assistance claim, perhaps using a substantive analysis of the underlying challenge for cause to J.L.P. to discover whether such a challenge would have succeeded, and deciding whether Jones was prejudiced by counsel's failure to make the challenge.

¶4 The majority follows another, more confusing, path. The majority begins appropriately, by discussing the merits of the claim regarding L.J., and concludes that the trial court did not err in denying the challenge for cause. However, the majority does not conduct the second part of the analysis and determine whether that claim was preserved by Jones's request for an extra peremptory hearing to remove a sitting juror, J.T.W. The majority instead moves on to a substantive analysis of the juror J.L.P., reviewing the record to determine whether J.L.P. was subject to a challenge for cause, even though this is not raised as a substantive proposition of error. After determining that J.L.P. was not subject to a challenge for cause, the majority turns to the ineffective assistance claim. However, the majority does not simply hold that, as the opinion just found that J.L.P. was not subject to a challenge for cause, counsel was not ineffective for failing to make such a challenge. Instead, the opinion chooses this time to review Jones's effort to preserve his appellate issue of challenges for cause by requesting an extra peremptory. The majority's ineffective assistance analysis never refers to J.L.P.'s fitness as a juror, but reviews the information in the record about J.T.W., the juror Jones said he would excuse with an extra peremptory were one available. Any discussion of J.T.W.'s fitness is entirely irrelevant in this context. This is particularly true because the record shows that Jones named J.T.W. as an unacceptable juror in the context of the trial court's failure to excuse L.J. As trial counsel did not ask that J.L.P. be excused for cause, his extra peremptory request could not be associated with J.L.P. and any discussion of Jones's attempt to preserve the issue of challenges for cause has no bearing on the ineffective assistance claim.

¶5 Jones claims that he was forced to use peremptory challenges on two jurors who should have been excused for cause. Each of these jurors stated at some point that they could be fair, listen to the evidence, and consider all three punishments. However, any doubt about juror bias should be resolved in the defendant's favor.[1] A juror's bias need not be proved with unmistakable

---

1. *Warner v. State*, 2001 OK CR 11, 29 P.3d 569, 572.

clarity.[2] Based on the record, I doubt both jurors' fitness to serve on this jury.

¶ 6 Prospective juror L.J. made clear that she had grave reservations about her ability to give Jones a fair trial if he claimed self-defense for killing five victims. The trial court continued to question L.J., rejecting her own statement that she was very concerned about her ability to be a fair juror, until the juror finally conceded that she could listen to the evidence and reach a proper verdict. The majority defers to the trial court's judgment of L.J.'s credibility. I find the record is not ambiguous and supports the conclusion that L.J. should have been removed for cause.

¶ 7 Prospective juror J.L.P., an Oklahoma City police lieutenant, may or may not fall within the new statutory exclusions from jury service involving law enforcement officers. I note that the majority's reading of the revised statute is extremely narrow.[3] I am not convinced that the Legislature intended to automatically exclude only jailers or guards with this statutory revision. I believe it is likely that J.L.P., in his current assignment as a field supervisor or street cop, has some responsibility for custody of prisoners.[4] Jones argues J.L.P. also should have been excused for actual bias. I agree. J.L.P. knew several of the officers connected with the case and supervised one of the State's witnesses. He stated that he was fair and would not be biased toward police officers.

However, as I read the record his professional duties and associations indicate that he should have been excused for cause.[5]

¶ 8 The majority opinion misstates the law regarding preservation of the issue of challenge for cause for appellate review. A defendant who raises this claim must first preserve it by naming, at trial, an unacceptable sitting juror he would have excused with another peremptory challenge.[6] The majority erroneously concludes that Jones failed to do this, although the record and the opinion itself show otherwise. After using his last peremptory challenge Jones asked for an extra challenge, naming juror J.T.W. as the juror he wished to excuse. Jones stated that J.T.W. was both biased and very young. The majority reviews this as though it was a substantive issue and concludes that, in its opinion, J.T.W. was not unacceptable. Therefore, the majority finds, Jones "has not pointed to a juror whose presence on the jury prevented him from having a fair trial." [7]

¶ 9 This conclusion misstates the standard of review and shows a basic misunderstanding of the law in this area. The requirement that a defendant name an unacceptable juror is a simple procedural requirement designed to preserve the voir dire issue for appeal. That is all. A defendant cannot separately raise an "unacceptable juror" claim as a substantive issue; the substantive issue on appeal is always whether a different juror

2. *Rojem v. State*, 2006 OK CR 7, 130 P.3d 287, 295; *Hanson v. State*, 2003 OK CR 12, 72 P.3d 40, 48.

3. While *Rojem* found that a person who supervised inmates in a city work center was included in the statutory exemption, it did not hold that the statute applies exclusively to persons having custody of prisoners as their primary duty. *Rojem*, 130 P.3d at 294.

4. I agree with my former colleague Judge Strubhar, who noted that a police officer who patrolled in a marked unit and made arrests "necessarily had custody of prisoners from time to time" and should be excused for cause under 38 O.S.2001, § 28. *Warner*, 29 P.3d at 572 n. 5.

5. *See Plantz v. State*, 1994 OK CR 33, 876 P.2d 268, 278 (record belied juror's claim that she could be fair); *Tibbetts v. State*, 1985 OK CR 43,

698 P.2d 942, 946 (juror could not be impartial, despite her statement otherwise, where her son-in-law was county deputy sheriff, had applied for a job with the county district attorney, and was present at trial); *Hawkins v. State*, 1986 OK CR 58, 717 P.2d 1156, 1158 (despite stating she could be fair, wife of county sheriff should not have been placed in the potentially compromising position of juror).

6. *Browning v. State*, 2006 OK CR 8, 134 P.3d 816, 830; *Warner*, 29 P.3d at 574.

7. Majority Opinion at 880. I suspect the majority uses this phrase, which has no place in the test of whether a defendant preserved a challenge for cause claim for review, because the majority is writing in the context of the ineffective assistance of counsel claim and inexplicably chose this avenue to deny that claim. This is one example of the legal incoherence caused by the opinion's flawed structure on this issue.

should have been excused for cause. In determining whether this procedural requirement is met we ask whether the defense named an unacceptable juror. If that was done, we proceed to the substantive voir dire issue, which is whether another juror should have been excused for cause. If we find the trial judge did not err in not removing the juror for cause, we do not reach the substantive voir dire claim unless there is plain error present. A defendant need not show, to meet this procedural requirement, that the juror's presence prevented him from having a fair trial. He need only show that he found that particular juror unacceptable and would have excused that juror with a peremptory had he been able to do so.[8] It is critical that we keep in mind here that the ultimate issue involved in this requirement to "preserve" the error is whether or not the trial court erred in failing to excuse a particular juror for cause, thereby causing the defense to forfeit a peremptory challenge.

¶ 10 The majority, by contrast, treats the procedural requirement as a separate claim requiring substantive appellate review. This adds an unnecessary layer of complexity to a simple test: did the defendant preserve the claim?[9] This Court cannot determine on review whether any particular juror was unacceptable to the defense. That is the standard of review and the point of the requirement—the defendant must claim that some other juror was unacceptable *to him*, and he would have used a peremptory challenge against that juror. This Court's own opinion of the sitting jurors is simply irrelevant to this inquiry.[10] The majority reviews the record and determines that the Court would not find J.T.W. unacceptable. This is exactly the sort of inquiry we cannot and should not engage in.

¶ 11 The absurdity of the majority's approach can be shown by a simple hypothetical. Assume in a death case that a trial judge flatly refuses to excuse any juror for cause. Assume also that nine jurors clearly state that they are irrevocably committed to the view that any person who commits premeditated murder forfeits the right to live and must be given a death sentence. Assume further that the defense challenges each such juror for cause and each challenge is denied by the trial judge. Assume that in each instance the defense uses one of its peremptory challenges to remove each one of these biased jurors and in each instance objects, asks for an additional peremptory, and names another juror who is unacceptable to the defense. Now, here we have a case where a defendant has been erroneously denied all nine of his statutorily allotted peremptory challenges. If the issue is raised on appeal what does this Court do? Do we review whether a defendant has been denied a fundamental right to nine peremptory challenges by determining whether or not the nine jurors should have been excused for cause, or do we look at the nine jurors who sat and were deemed unacceptable to the defense and determine whether they are unacceptable to us? The answer, of course, is obvious. I recognize the hypothetical is extreme. But it puts the issue in perspective. And, because a single juror can determine whether or not a death sentence is imposed, the loss of a single peremptory challenge can mean the difference between life or death.

¶ 12 As I note above, the majority apparently is confused by the ineffective assistance of counsel claim. In reviewing the ineffective assistance of counsel claim the majority naturally begins by looking to see whether, if the claim were true, Jones suffered any preju-

8. *Jones v. State*, 2006 OK CR 17, 134 P.3d 150, 155; *Hanson*, 72 P.3d at 49.

9. This is like an objection at trial. Counsel must preserve a claim for appellate review by objecting. This Court will look at the record to see whether the defense objected and, if he did, will review the claim of error on its merits. We may well find that the claim fails on the merits. However, we do not then say that, because the claim failed on its merits, the objection was not preserved.

10. I recognize that in the federal system the question becomes whether, despite any voir dire irregularities, the jury which heard the case was fair and impartial. However, our system allows peremptory challenges and gives both parties discretion to excuse jurors which they find unacceptable. In that context this Court may not substitute our opinion of the jurors for trial counsel's when resolving voir dire issues.

dice. If he were not prejudiced by counsel's failure to challenge juror J.L.P. for cause, counsel would not be ineffective. However, the majority's analysis goes astray. Instead of reviewing the record surrounding J.L.P., the majority reviews the record surrounding the unacceptable juror, J.T.W., concludes that juror was not unacceptable, and finds that Jones did not show J.T.W.'s presence prevented him from having a fair trial. That is simply not the question. Jones has asked us to determine whether counsel should have challenged J.L.P. for cause. Any discussion of this issue should revolve around J.L.P. The majority already conducted a substantive analysis of J.L.P.'s fitness to serve. While I do not agree with the conclusion, that discussion would serve as an appropriate basis for rejection of the ineffective assistance claim. The majority apparently wants to discuss the "unacceptable juror" question. If so, the proper place for that discussion is in the analysis of the claim regarding the challenge for cause to L.J., which currently lacks any discussion of whether Jones preserved that claim for appellate review. Because I believe J.L.P. should have been excused for cause, I would find counsel was ineffective for failing to so request.

¶ 13 I agree with the majority's conclusion in Proposition I that the trial court should have allowed Jones to present evidence that the victims had detectable, and even significant, amounts of methamphetamine in their blood at the time of their deaths. However, I cannot agree that the exclusion of this evidence had no effect on the jury's decisions. Jones claimed that he was faced with a mob of crazed adults under the influence of methamphetamine, which made them unpredictable and belligerent. The majority suggests that other evidence showed the victims had been drinking and smoking marijuana, so there was evidence to support Jones's claim that the victims were on drugs. This is ridiculous. Even a lay person is aware that marijuana and alcohol use has very different effects and results in different behavior than the use of methamphetamine. Jones was making a very specific claim about a particular type of drug use commonly known to lead to aggressive behavior and bad judgment. This claim was supported by forensic evidence. I agree with the majority that the circumstances of this crime—Jones entered the house armed and shot multiple unarmed victims several times—make it unlikely that jurors would believe a self-defense claim. For that reason I find the admission of this evidence essential. Forensic evidence corroborating Jones's claim that his victims were high on methamphetamine might well have made a difference to jurors who were reviewing the possibility that he acted in the heat of passion, who were judging witness credibility, and who were reviewing mitigating circumstances. I cannot agree with the speculation that the admission of forensic evidence supporting Jones would have had no effect on the jury.

¶ 14 I agree with the majority finding in Proposition II that the trial court erred in refusing to allow defense witness Robert Clark to testify he saw bruises and scratch marks on Jones's neck when he was arrested several hours after the killings. I cannot agree that this error was harmless, or that Jones was not prejudiced by counsel's failure to correctly endorse the witness. The Court suggests that the evidence might have been impeached with other evidence suggesting that Jones got the marks either a year before the crimes or in the hours afterwards. The Court thus finds that the evidence could not have affected the jury's deliberations because it might be attacked in two inconsistent ways. This makes no sense. Clark could have presented eyewitness testimony which corroborated Jones's claims that he had fought with the victims. While this was certainly subject to impeachment, it would have provided jurors confirmation of Jones's story. The evidence came not from Jones's friends or family but from a detention officer, which might have made it more credible in jurors' eyes. This claim must be analyzed in light of the juror's inability to consider forensic evidence which also supported Jones's story. Taken together these two rulings prevented jurors from hearing any independent evidence supporting Jones's claims, or considering it as they deliberated. I simply cannot find that exclusion of this evidence could have had no effect on the jury's decisions.

¶ 15 I also agree with the majority finding in Proposition III that the trial court erred in allowing Officer Hernandez to repeat hearsay statements from Carla Phillips during his testimony. Once again, I do not agree this error was harmless. The majority states that Phillips's statements as reported by Hernandez did not differ radically from her trial testimony. It is true that parts of the out-of-court statement and testimony coincide, and that other witnesses supported parts of the out-of-court statement. However, the main point of Phillips's statement to Hernandez—and the question at issue in the trial—is that without arguing with any of the victims, and after being asked to leave once, Jones began shooting randomly at the people in the house. This differs dramatically from Phillips's trial testimony, testimony of other witnesses, and Jones's story, all of which state that Jones began arguing with Tara Platt and the conflict escalated before the shooting began. Jurors should not have heard Phillips's hearsay statements, and they sharply contradicted the remainder of the testimony describing the circumstances of the crime. Particularly when combined with the errors in Propositions I and II, which left the jury unable to consider independent evidence supporting Jones's story, I cannot find this error had no effect on the jury's deliberations.

¶ 16 Jones committed a series of horrible, senseless crimes. As the majority notes, a jury which heard relevant and admissible evidence supporting Jones's version of events may well have convicted him and returned the same sentences as he received. However, Jones's jury did not have the chance to consider that evidence, although he tried to offer it. I believe that this Court should not substitute its after-the-fact judgment for that of a fully informed jury. I would reverse and remand for a new trial, where a jury may consider the evidence for and against Jones. I also note that this opinion is yet another case in which a majority opinion in a death case finds multiple serious errors, but affirms a death sentence by concluding the errors were individually harmless. Certainly there is a place for the harmless error concept in our law. But I believe we should be very careful about its use where multiple serious errors occur. I dissent.